1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF PUERTO RICO

3    **ALMA SIMONET, ET AL,**         *  CV. 06-01230(GAG)
                                      *  COA 09-2434
4            Plaintiffs,             *
                                      *  San Juan, Puerto Rico
5       vs.                          *
                                      *  27 July 2009
6    **SMITHKLINE BEECHAM CORP.,**     *
     **d/b/a/ GLAXOSMITHKLINE PUERTO** *  4:00 p.m.
7    **RICO, INC., ET AL,**            *
                                      *
8                                     *
             Defendants.             *
9                                     *

10

11                **FINAL FAIRNESS HEARING**

12         BEFORE THE HONORABLE **GUSTAVO A. GELPÍ**
              UNITED STATES DISTRICT COURT JUDGE

13
     **APPEARANCES**

14
     COUNSEL FOR THE PLAINTIFFS
15   **JOHN NEVARES, ESQ.**
     **CAMILO SALAS, ESQ.**
16   **CARLOS RAMIREZ, ESQ.**
     **JEFF WEINSTEIN (PHV), ESQ.**
17   **HERBERT BROWN, ESQ.**
     **FRANK INSERNI, ESQ.**
18   **MICHELLE BONILLA, SOTOMAYOR, ESQ.**
     **EUGENIO E. IBARRA, PEREIRA, ESQ.**
19   **WELLS G. WILKINSON (PHV), ESQ.**

20

21   COUNSEL FOR THE DEFENDANTS

22   **ANY ROSSELL BARRIOS, ESQ.**
     **FRED HEROLD (PHV),  ESQ.**
23

24

25            **YVETTE RICHARDSON, CSR, RPR, CCR**
                    **(787) 772-3476**

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

2

1          **P R O C E E D I N G S**

2          THE COURT:  Now let's call the Simonet case.

3          THE CLERK:  In civil case 06-1230.

4          Proceedings:  Final fairness hearing.  Plaintiffs of

5   record shall identify themselves for the Court.

6          MR. NEVARES:  Good afternoon, Your Honor.  My name is

7   John Nevares and I represent class counsel together with

8   Mr. Camilo Salas and Mr. Brian Strange.

9          MR. BARRIOS:  Good afternoon, Your Honor.  Rossell

10  Barrios representing defendants.

11         MR. HEROLD:  Good afternoon, Your Honor.  Fred Herold,

12  also representing the defendants.

13         THE COURT:  Okay.

14         MR. WEINSTEIN:  Your Honor, Jeff Weinstein representing

15  Clay Bain, objector, and you have allowed me to be admitted pro

16  hac.  Thank you.  And I am here with local cocounsel, Mr.

17  Herbert Brown.

18         MS. BONILLA:  Good afternoon, Michelle Bonilla

19  Sotomayor in representation of objectors, William and Catherine

20  McWhorter and Susan Colvin.

21         THE COURT:  Mr. Inserni.

22         MR. INSERNI:  Frank Inserni.  I am pro hac vice for the

23  estate of Keith Allen and one of the objectors to the

24  settlement.

25         THE COURT:  You are not pro hac vice.

                    YVETTE RICHARDSON, CSR, RPR, CCR

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

3

1          MR. INSERNI:  I am sorry.  I am local counsel.  Pro hac

2   vice counsel, Mr. John Spence.

3          THE COURT:  Mr. Spence is not here.

4          MR. WILKINSON:  Good afternoon, Your Honor.  My name is

5   Wells Wilkinson.  I am an attorney here on behalf of objector

6   Diane M. Fox and I am here with local counsel, Raul Mariani.

7          MR. MARIANI:  Good afternoon, Your Honor.

8          THE COURT:  At least in Mr. Mariani's and in

9   Mr. Brown's case, if you want to stay here, of course, you are

10  not going to be doing the argument, you are welcome to stay.  I

11  know Mr. Mariani wants to be excused.  Of course, you are

12  welcomed.  If you want to participate you may participate, but

13  I have no problem with having pro hac vice counsel, by

14  themselves, argue the case.

15         What we will begin by doing is, and again, I intend to

16  hear everybody.  I will be recessing around 3:30 or 4:00 at the

17  latest.  If we need to continue we will continue tomorrow.

18  Everybody will be heard.  There have been a lot of motions.  I

19  think everything has been ruled upon.  There are a couple in

20  abeyance pending.  What I would propose then is that, first,

21  counsel for plaintiffs go first.  Then counsel for

22  GlaxoSmithKline go next and then we will have the objectors

23  counsel go next.  I know there have been some objections filed

24  but counsel are not here or it is impossible for them to come.

25  My inclination is to consider them along with all other

1    objections.  And that's my inclination, but I can hear from

2    counsel before I make a final ruling as to that.

3            Mr. Strange, please go ahead.

4            MR. STRANGE:  Thank you, Your Honor, and good

5    afternoon.  Brian Strange for the plaintiff class.  If it is

6    acceptable to the Court I would propose that I would address

7    the issue of the final fairness of the settlement and the

8    objections, as they pertain to the settlement; and Mr. Nevares

9    will address the issue of attorney's fees and the objections,

10   as they pertain to the attorney's fees.

11           Your Honor, this case began in 2004 in California.  As

12   Your Honor is aware, my firm along with two other firms

13   initiated the case in 2004 in California.

14           THE COURT:  In state court, correct?

15           MR. STRANGE:  In state court.  It was a very vigorous

16   litigation.  There were nine motions to dismiss, including two

17   motions for judgments on the pleadings regarding preemption.

18   There was four amended complaints.  There were writs of mandate

19   to the Court of Appeals.  There were 11 status conferences over

20   the five years.  There were tens of thousands of documents

21   produced by GlaxoSmithKline.  There was a discovery referee

22   appointed who addressed numerous discovery motions to compel.

23   There was numerous witness interviews that we conducted with

24   respect to employees and former employees at the plant here in

25   Puerto Rico.  There were expert witnesses that we retained,

 1   formerly employed by the FDA, regarding the status of the

 2   production of the drug called Paxil here in Puerto Rico.

 3            The essence of our case, Your Honor, and the reason

 4   there were so many substantive motions to dismiss, which in

 5   California state court we call demurrers, is because we

 6   contended, the plaintiffs, that we were entitled to seek only

 7   economic injury for the purchases of defective Paxil.  Our case

 8   did not concern personal injuries.  So the big issue that

 9   GlaxoSmithKline raised is if you received a pill you have to

10   prove that it didn't work or how have you been injured.

11            And so there was a big causation issue and a big damage

12   issue.  And, ultimately, we focused, Your Honor, on receiving

13   split pills.  Our contention was that because of the defects in

14   manufacturing the pills split apart.

15            So we began to do and did extensive analysis in the

16   case about how many -- what is the extent of damages; how many

17   split pills were there.  And we still, mind you, have the

18   problem of did our plaintiffs receive a split pill.  And, if

19   so, can they produce it?

20            So the legal question of whether there was damages, and

21   then the factual issue of how many damages -- how much of the

22   pills were manufactured with the split-pill problem became an

23   issue.  GSK contended, based on documents in their files, that

24   only eight parts in a million of these Paxil pills had the

25   problem with splitting apart.  We both agreed that there were

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

6

1    approximately 700 million Paxil pills produced and sold during

2    the class period.  And our evidence was, and our best argument

3    was approximately two percent of all the pills they produced

4    have the problem with splitting apart.

5         So the damages, Your Honor, range from 8 parts to a

6    million to this two percent or approximately 50,000 to the

7    outside of 42 million, if we prevailed on our theory of damages

8    and through class certification.

9         And in our case, by the way, we filed two extensive

10   motions for class certification, which have not been ruled

11   upon, but include all the affidavits from our experts and our

12   physicians on class certification.  The reason there were two,

13   Your Honor, is that we did add a third party payor, Universal

14   Care, into the case and then filed an additional class

15   certification on that issue.

16        So, when ultimately we began discussing settlement with

17   SmithKline we, the plaintiffs, combined our case with the

18   Simonet case down here so we could come to some kind global

19   resolution if possible.  And we came to settlement discussions

20   that lasted individually and collectively over a year with

21   SmithKline counsel.  And SmithKline's position, not

22   surprising,l,y was that our case wasn't worth much.  As the

23   plaintiffs, we obviously vigorously disputed that.  And after

24   extensive negotiations we were able to convince SmithKline to

25   settle for 28 million dollars; up to 28 million dollars, which,

 1    based on the facts of this case, is, in our opinion, a

 2    spectacular settlement because of the offer, because of the

 3    problems of proof, the problems of damages and the problems

 4    with liability.

 5         And we, ultimately, split the 28 million with 40

 6    percent going to the third-party payors.  That is 11.2 million

 7    in a cash fund to the third-party payors and 60 percent to the

 8    consumers or 16.8 million available to the consumers to claim.

 9         We then presented to Your Honor on March 2nd a

10    preliminary approval motion.

11         THE COURT:  Before you go into that, I believe, and it

12    is important for the record, I believe there was a motion to

13    dismiss filed in this case; am I correct?

14         MR. STRANGE:  In the Simonet case there was a motion to

15    dismiss filed before Your Honor and Your Honor did reissue an

16    opinion on it.

17         THE COURT:  There was an opinion because I do remember

18    it took considerable time.  And there were replies and

19    surreplies.  And I do remember Mr. Barrios, when he came in,

20    had to request several continuances because when -- Mr. Barrios

21    can speak about this, but I think it was the representation at

22    that point -- again, it was not a simple 12(B)(6) motion.  And

23    it was pretty complicated and the opinion order was 20 or 25

24    pages long.

25         MR. STRANGE:  Yes, Your Honor, and we did in California

 1   follow that opinion closely in your case.  And it is not unlike

 2   the complicated decisions that our court had to decide either.

 3          THE COURT:  And let me ask one thing, and also I want

 4   to hear from GSK.  Let me not assume, but let me ask, did that

 5   opinion or that ruling that I issued also carry some weight, I

 6   assume, in the settlement negotiations; am I correct?

 7          MR. STRANGE:  Yes, Your Honor, it did.  It was very

 8   instrumental in at least getting GlaxoSmithKline to the table.

 9   Obviously if they had won they wouldn't have settled my case

10   either.

11          THE COURT:  We wouldn't be here.

12          MR. STRANGE:  We wouldn't be here.  But recognizing

13   from both sides that that was both a difficult, very

14   complicated issue.  And only one of the many issues that we

15   were going to face along the road, both in class certification

16   and, ultimately, should we come to a trial, whether we can

17   prove the plaintiffs had split pills.  And, if so, even if they

18   had a split pill, what effect, how were they damaged by that.

19   The difficulty is we are dealing with economic damages and not

20   personal injury claims.

21          So, ultimately, after extensive negotiations we did get

22   what we believed to be an excellent settlement for the class in

23   this case with respect to the split pill issue.  Your Honor had

24   a preliminary approval hearing on March 2nd where you approved

25   a rigorous notice program.  We hired Cancilla Media, who is a

1    recognized expert in the class action notice arena.  They have

2    filed two declarations with the Court outlining the notice.

3    But suffice it to say that Cancilla Media has been involved in

4    over 500 notice programs, hundreds of millions of dollars they

5    spent in media.  They have qualified as an expert in numerous

6    federal courts regarding notice.  And they have opined in this

7    case both in the preliminary approval stage and in response to

8    objections about notice that this notice meets all the

9    requirements of Rule 23.  We provided direct notice to the

10   third-party payor class which we were able to obtain the names

11   and addresses through information by Mr. Miller's firm,

12   indicated in the notice.  We had a broad notice for paid media

13   which included over 2,100 newspapers, every major media market

14   in the country.  We had, in addition, consumer magazines such

15   as *NewsWeek, People* and TV *Guide* and various trade magazines

16   with third-party payors.  We also had TV spots regarding the

17   settlement occurred 72 times on CBS, CNN Evening News, CNN

18   News, Lifetime Movie Channel and the Movie Channel and the

19   Hallmark Channel; and we also had a press release that went to

20   over 4,500 outlets.  We had a dedicated website.  We did a word

21   search on Google and Yahoo, and we have an opinion from our

22   expert that they reached over 80 percent of the market with

23   respect to this extensive notice which cost well in excess of a

24   million dollars.

25          After receiving the notice we are here today for a

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

1    final approval.  We have -- my firm has, in particular, been

2    certified as class counsel in numerous cases throughout the

3    country.  And, in fact, we have settled regarding the issue of

4    Paxil that was sold to children in a case called Hormon which

5    was in state court in Illinois on a national settlement and a

6    third-party payor case in Minnesota on a national settlement

7    approved by the court there.  So we have experienced counsel

8    both on the plaintiff's side, Mr. Nevares and Mr. Solas, and

9    also on GSK's side.

10        And we have, after all that notice, we are down to,

11   really, four objections that I would like to briefly address at

12   least as the objections pertain to the final fairness hearing.

13        One objection -- first, I might state, in due respect,

14   the objectors are not unknown to me, having settled numerous

15   class actions.  All of the objectors have objected in numerous

16   other cases after a settlement has been obtained.

17        Mr. Pentz, who represents the Sweeney objectors, who

18   apparently is not here today, has personally -- is a

19   professional objector who has objected in at least five of my

20   personal cases, including a case against Fleet Bank, a case

21   against CitiBank, a case against Sprint up in New Jersey.

22        THE COURT:  Is he an attorney or he is just -- I know

23   there was somebody who objected who is not an attorney who I

24   did not allow to object.

25        MR. STRANGE:  Yes, you struck the Sweeney objection

YVETTE RICHARDSON, CSR, RPR, CCR

**06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS**

11

1   because he wasn't a lawyer and then he brought in Mr. Pentz who

2   is a lawyer who is not here today, but who requested to be, I

3   think, admitted pro hac vice.

4          THE COURT:  That is through Mr. Inserni.  Okay.

5          MR. STRANGE:  Yes, Your Honor.

6          THE COURT:  So he is represented by counsel.

7          MR. STRANGE:  Yes, Honor.  And First U.S.A. is another

8   case so Mr. Pentz has objected in numerous cases.  Mr.

9   Weinstein, who is here today, is from Texas.  And just doing a

10  quick search on Lexus he has objected in the In Re: Pet Food

11  Products litigation, Park vs. Thomas, McCoy vs. Health Net,

12  McGee vs. Continental Tire, Progressive Corp. vs. Corp.

13  Underwriting and In Re: Ford Explorer cases, just to name a

14  few.  And the PAL Prescription Coalition has also previously

15  objected in our cases in Illinois and the one in Minnesota.

16  Both objections were overruled.  One of them was withdrawn

17  ultimately.

18         And the McWhorter objectors, interestingly, I was not

19  familiar with them.  But they are actually listed in the

20  Nichols versus SmithKline case as an objector where their

21  objections, same objections, similar objections were overruled

22  in that case which is cited in our papers.

23         To get to the substance of the objections, Your Honor,

24  the first with respect to the argument that you can't certify a

25  national class because of differing state laws, national

1    classes based on differing state laws are certified almost

2    routinely in this country every day.  The AM-CAM case by the

3    Supreme Court actually, I think, supports our position because

4    that case holds that in a settlement context the issue of

5    manageability is not one that would preclude settlement because

6    you are not having a trial.  You don't have to manage the

7    trial.

8         And one of the objections raised with respect to

9    varying state laws is you have to have different kinds of jury

10   instructions with potentially different elements to be proved

11   and different burdens of proof.  And in a settlement context,

12   as the Supreme Court points out, that issue goes away because

13   you don't have a trial.  And that is supported by this circuit

14   in the waste management case that we cited.  In the Warfarin

15   case which is a 3rd Circuit case, which is a drug-related case

16   on behalf of third-party payors and consumers, just like this

17   case, the Court was faced with that issue and overruled that

18   objection.

19        THE COURT:  Let me interrupt.  I understand that if

20   this case were to go to trial there is also the issue that

21   different state laws apply.  Not under the law of every state

22   you would have the exact same claims.  The instructions may be

23   different, but the law may be different in different states.

24   And in some states you may have X claim under -- again, I think

25   in my opinion I went through all the different laws of the

1    different states.  A lot of states are alike in a lot of

2    things, but there are some differences.

3          MR. STRANGE:  Yes, Your Honor.  There are similar

4    states and then there are the different states.  But, as the

5    Supreme Court points out, that that issue of, you know, how to

6    manage different state laws goes away in a settlement context

7    because you are not having a trial.

8          And so the -- clearly the majority of cases that have

9    considered that issue have held that a national settlement is

10    appropriate.  And, as I mentioned, in the Warfarin case

11    particularly the Court dealt with a case very similar to this

12    one.  I also might point out, Your Honor, that in the Hormon

13    case which is a state court case against GlaxoSmithKline that

14    was settled, the court certified a national class with

15    differing state laws, and also in the federal case in Minnesota

16    we were involved in the Court certified a national case with

17    different state laws.

18          And, finally, I would point out that the objectors

19    raise an issue of privity required in some laws, but not other

20    laws.  But that is not true of all our claims.  And the

21    controlling authority says you don't have to have identical

22    claims and identical facts in order to certify a case on a

23    national basis.

24          The only case the defendants have or the objections

25    have come up to is in the In Re: Grand Theft Auto case, which a

1  district court decision.  But in that case you need to look at

2  the facts of obviously each of the cases.  And in that case it

3  involved a grand theft auto game.  And the contention of the

4  plaintiffs was that the rating was incorrect because if you

5  knew how to manipulate the game you could get into the part of

6  the game that had some inappropriate sexual content.  And the

7  court in that case noted that the evidence was that 2/3 of the

8  class did not even know about that.  Even if they knew about it

9  you had to be personally able to manipulate the game or hire a

10  third party to change the game.  So the defendant had an

11  unclean hands defense that said if you didn't like the sexual

12  content why were you hiring someone to get to that part of the

13  game.

14  So the facts of that case are distinctly different from

15  this case where we are contending based on the defendant's

16  conduct in manufacturing these pills, which is the same for all

17  the plaintiffs, that the pills were defective and could

18  potentially split apart.

19  So, we have cited extensively in our brief to all of

20  the cases which have held that certification of a case in this

21  instance is completely appropriate.  Not only appropriate, but

22  encouraged.

23  The other objection I wanted to mention, Your Honor, is

24  with respect to the claims-made portion of this settlement for

25  the consumers only.  The third-party payors, of course, are

1    paid based on their -- how many covered lives they have.  With

2    respect to the claims made of the consumers, that was a

3    negotiated term that we fought with GSK on.  And the fact that

4    we have an extensive notice program and the ability of

5    consumers to make claims, these types of claims-made

6    settlements are routinely approved; and, in fact, were approved

7    in the Hormon case, which was a claims-made settlement based on

8    Paxil.  And there is no case that says it is inappropriate to

9    have a claims-made settlement or that reversion, if you want to

10   call it that, is inappropriate.  In fact, the cases that we

11   cited to Your Honor specifically held that that is an

12   appropriate feature of a negotiated settlement.

13        The next issue I wanted to mention is notice.  With

14   respect to the notices, I have indicated that we have a very

15   robust notice program.  There was -- there is an argument by

16   PAL, the prescription access group, that the notice is

17   insufficient because we should have subpoenaed all the

18   pharmacies.

19        But that, I submit, there has only been a few cases

20   that have done that.  We have mentioned them by our

21   supplemental experts' declaration.  Two of those cases involve

22   U.S. attorneys who negotiated with the pharmacies.  The third

23   was an order from the Court.

24        In these circumstances there are two distinct

25   differences.  One, of course, we have a major rights of privacy

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

16

1    issues if we were to try to subpoena pharmacies.  The rights of

2    the patients not to have that information released would be a

3    massive issue that would have to be dealt with both by our

4    clients, the class, and by the pharmacies.

5         And, moreover, in this case, Your Honor, our definition

6    is all those people that purchased Paxil, but the people that

7    make claims are those with the split pills.  In the cases, in

8    the very, very few cases that have subpoenaed pharmacies, they

9    are antitrust cases.  So that everybody who is on the list of

10   the pharmacy would be able to make a claim.  So that's not true

11   here because everybody at the pharmacy would not be able to

12   make a claim.  So it would be very overinclusive, very

13   expensive, and not appropriate on the facts of this case.

14        The other objection with respect to notice was that the

15   notice should have said something about reversion and should

16   have said something about the size of the class and the amount

17   of the claims.

18        This specific type of objection was overruled in the

19   *Nichols vs. SmithKline* case and has been overruled in numerous

20   other cases where the courts have held that under Rule 23 the

21   issue of notice is to give a description of the case and how

22   people can make a claim and how they can find more information.

23        And that is, specifically, the Court ruled that the

24   notice in the Nichol's case had a description of the

25   plaintiff's claims, the general terms of the settlement, the

1    proposed allocation of the fund, the rights being released, and

2    how people can obtain more information.  Those are the exact

3    items mentioned in our notice.

4         And in the Nichol's case the Court overruled the

5    objection by the McWhorter people, the same people objecting

6    here, that the notice had to state the amount of damages

7    suffered by the class.  Where they couldn't assess a fair

8    assessment of the settlement the Court overruled that objection

9    because it is not required under Rule 23.

10         The issue of the adequacy of representation, there

11    seems to be a misunderstanding, but with respect to the

12    settlement agreement, my firm along with J. D. Horton

13    represented the third-party payors at this settlement

14    discussion.  Mr. Salas and Mr. Nevares represented the

15    consumers.  So there was separate counsel there.

16         And, finally, Your Honor, with respect to the PAL

17    organization, they don't have standing to object to the third-

18    party payors, which is an issue that we raise because they

19    haven't identified a specific third-party payor that they

20    represent; and we have cited the appropriate cases for

21    standing.

22         And in the *Hormon* case they made the same objection and

23    the Court ruled they didn't have standing there because they

24    don't represent someone.  They have now amended their

25    objections on behalf of a consumer, Ms. Fox, but I will note

1    that that objection was made on July 21st.  And Your Honor's

2    order provided that it be filed on the 18th.  And so it is

3    untimely.  Even if it wasn't untimely, for reasons I have

4    articulated it doesn't have merit.

5            THE COURT:  When was it actually filed?  I gave until

6    the 18th.

7            MR. STRANGE:  I think it was filed on the 21st is the

8    file stamp.  Overall, Your Honor.

9            THE COURT:  I assume the 18th was a --

10           MR. STRANGE:  It was a Saturday.

11           THE COURT:  The 18th.

12           MR. STRANGE:  Yes.

13           THE COURT:  And probably Monday may have been a local

14   holiday.  I will give the party that.  I will give them the

15   benefit.  I believe I can strike that with respect to untimely.

16           MR. STRANGE:  I figured you would do that, Your Honor.

17   And I would like to point out you have been more than generous

18   with respect to allowing these objections and we have addressed

19   them as best we can on the merits.

20           But, overall, Your Honor, as Your Honor knows, from the

21   order you issued and throughout the vigorous defense put up by

22   GSK in this case, to get a 28 million dollar settlement on

23   potential damages that could go anywhere, even if we won

24   liability, from 50,000 to 42 million is a superb settlement.

25   And I would make one other point, that even if we proceeded to

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS
19

1    trial and won under the *Boeing* case GSK would be entitled to

2    reversion of all those damages that weren't claimed by the

3    plaintiffs.

4         So the result that has been obtained for the class here

5    is, based on the facts of this case, an excellent one and I

6    would encourage the Court to approve it in this final fairness

7    hearing.  Unless the Court has any questions, I am finished

8    with mine.

9         THE COURT:  I do have some questions.  I am probably

10   going to do them out of order.  But one of the objections is

11   that since the settlement notice was sent out the date of this

12   hearing has been changed twice.  And there is a claim that, for

13   example, a class member who wanted to be here today to object

14   can't be here today because there is no way for him other than

15   the original date and deadline of knowing when this hearing

16   would have taken place.

17        Of course, some of the objectors have obviously

18   appeared here.  But I would like to hear from you in that

19   respect.

20        MR. STRANGE:  Yes, Your Honor, the Courts routinely

21   reserve the right to continue a class fairness hearing, and it

22   routinely does happen.  And in notice we cited various means

23   for any objector who is interested to determine whether there

24   has been a continuance either through the web site, through a

25   toll-free number, through calling counsel.

YVETTE RICHARDSON, CSR, RPR, CCR

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS
20

1      THE COURT:  Let me assume that if I live in Montana or

2  I live in Iowa or I live in Guam or in Alabama, and I want to

3  object, if I look at the original notice there is a toll-free

4  number or there is a web site that will tell me today's date

5  and hearing.

6      MR. STRANGE:  The web site has since changed the date.

7  The web site didn't originally change the date.  But if they

8  called the toll-free number they would have been provided that

9  information.  And the bottom line, Your Honor, is that --

10     THE COURT:  Okay.  When was the web site date changed

11  for today that you have?

12     MR. STRANGE:  The date changed to today was fairly

13  recently.  I am not sure of the exact date the web site was

14  changed.  I don't know that, but I don't think the web site

15  itself -- I could be wrong about this -- I don't think the web

16  site date was changed on or around the time of your order.  I

17  am not sure about that.  But....

18     THE COURT:  Let me ask another thing.  Let's assume

19  there was a deadline to object.

20     MR. STRANGE:  Yes.

21     THE COURT:  And that deadline did not change.

22     That was -- actually, it did change when I extended it.

23  Was that reflected immediately on the web site or when was that

24  reflected?

25     MR. STRANGE:  I am not sure whether that was reflected

1    in the web site, Your Honor.  I mean, normally we probably

2    wouldn't do that.  But with respect to the objectors, to my

3    knowledge, there certainly isn't a case where someone, you

4    know, showed up on the original date and then had to change

5    their -- I mean, everybody that wanted to object, I believe, is

6    here today.

7         THE COURT:  That is great because even if we didn't

8    have the hearing and somebody showed up I would have been

9    informed because it has happened.  Not in this case, but it has

10   happened in other cases where persons would send letters.  And

11   I believe everybody who has objected, they are all here today.

12        MR. STRANGE:  Yes, Your Honor.  I don't think there is

13   a specific example.  It would be a little speculative that

14   someone who wanted to come didn't come.  But, to my knowledge

15   everyone, that wanted to appear is here today and knew about

16   the continuance.  And, obviously, some people wrote letters

17   which Your Honor will consider, I understand, today.

18        So to the extent there have been continuances, which

19   frequently happens, I don't think anybody has been affected by

20   that, that I am aware of.  And everybody has been able to voice

21   their objections.  And, just as a routine matter, the Court in

22   running its daily calendar is required to continue hearings and

23   it frequently does happen in these types of cases and everybody

24   does their best.  But there are certainly ways, if someone was

25   interested, for them to find out about a change in the date.

1   But, to my knowledge, everyone who wanted to object is here.

2           THE COURT:  Okay.  Thank you.  I have some other

3   questions, but I think they pertain more towards to what

4   attorney Nevares will be talking about.

5           MR. STRANGE:  Thank you, Your Honor.  At this point I

6   would like to turn the presentation over to Mr. Nevares with

7   respect to fees and any objections that pertain to those.

8           MR. HEROLD:  Your Honor, Fred Herold from GSK.  Would

9   you like to hear GSK's views?

10          THE COURT:  I was thinking about it.  I think it might

11  not be as -- it is probably going to be shorter, I think, a lot

12  of things.

13          Let's do that and then I will hear from Mr. Nevares and

14  then I will hear from all the objectors.

15          MR. HEROLD:  Your Honor, on behalf of GSK, we do agree

16  with plaintiffs' counsel that the objection should be

17  overruled.  I am going to try to focus on what I think are the

18  key issues.  One is the issue of the split tablets.  This case,

19  as Mr. Strange described, involved a number of difficult

20  issues, pleading issues, legal issues and factual issues.  And

21  in any settlement there is a lot of negotiation based on the

22  rulings, and as the case goes on, the development of those

23  issues.

24          There is one key factual issue here which the parties

25  have not agreed upon.  And that is one of the core issues which

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

23

1    is how many split tablets got out into the market.  It's been

2    GSK's position all along, based on documented studies of the

3    plant process and inspections, that no more than 8 parts per

4    million on average got out.  And that is based on inspections

5    that are done.  And then when there are split tablets found

6    there are steps taken after that to try to reduce the number of

7    split tablets.

8         THE COURT:  If that is the number, what would be the

9    percent under your number?  Under that number?

10        MR. HEROLD:  Eight parts per million number.  Your

11   Honor, I am not very good at math.  But I believe it is .00008,

12   I believe.

13        THE COURT:  Versus what Mr. Strange said, one or two

14   percent.

15        MR. HEROLD:  One or two percent, what the plaintiffs

16   said consistently.  If GSK is correct, as a factual matter,

17   that no more than eight parts per million got out, we agree

18   there are 700 million Paxil CR tablets that were related to the

19   market in the United States during this time period.  If you do

20   the math at eight parts per million you come out with 5,600

21   split tablets.  We also agree there was never a dispute that

22   the average price of a Paxil CR tablet is three dollars.  So if

23   GSK is right there are 5,600 split tablets out there with a

24   value of three dollars, the case is worth $16,600.

25        Now, obviously as Mr. Strange said, the plaintiffs did

YVETTE RICHARDSON, CSR, RPR, CCR

1   not agree with that.  That was a matter we had to choose

2   whether to try or not.  GSK is not in a position, nor the

3   plaintiffs, to say, okay, we know that Mrs. Smith in Oklahoma

4   got a split tablet.  GSK does not have records of who actually

5   purchased its drugs, who actually take its drugs.  There are

6   all kinds of privacy issues involved in that.  GSK sell to a

7   wholesaler.  Doctors prescribes the drugs.  GSK knows how many

8   of its drugs are prescribed, but it doesn't know who takes

9   them.  And none of us are in a position to be able to prove,

10  and we think this is a strength for GSK in the case, who took a

11  split tablet, who got a split tablet.

12       So the ultimate compromise that we reached, Your Honor,

13  in a key part of the settlement here is that GSK agreed to put

14  up up to 28 million dollars total, 16.8 million, for the

15  consumer class, which we believe was more than enough by a

16  factor of almost 1,000 to cover the damages that we think are

17  out there.  As long as that that amount was not claimed,

18  because we don't think there are that many split tablets out

19  there, we don't have to pay it.  That was a key part of the

20  settlement.

21       And one of the core objections here is that, you know,

22  that is not fair.  Because GSK should have to pay the whole

23  thing.  Well, we could have gone to trial.  And we think we

24  would have prevailed on the issue of how many split tablets

25  there were.  So that was a key part of the settlement that we

1    will put up the money, but if it is not claimed -- well,

2    actually the way it works technically, we only pay for the

3    claims that are made, as Mr. Strange said, it is a claims-made

4    policy on the consumers' side.

5         The other issue, Your Honor, which is important is we

6    worked very hard to come up with what we thought was a fair

7    claims process. Especially for consumers. We have a

8    two-tiered claims process. A consumer is entitled to fifty

9    dollars if he or she simply fills out a form, no notary. Some

10   objections talk about a notary. There is no notary requirement

11   in the settlement. Simply fills out a firm that says, "I

12   declare under penalty of perjury that I got at least one split

13   tablet." That is all they have to do.

14        I can tell that you it was a very difficult decision

15   for GSK to agree to that because we have experience in these

16   kinds of settlements where that is all you require where you

17   get a lot of claims that you don't think are legitimate. That

18   is all we agreed in this case. The minimal amount of fifty

19   dollars is enough to cover 17 split tablets, 16-2/3 split

20   tablets at three dollars each. So we think that is a very

21   generous, very generous and fair process.

22        Now, the odds statistically of someone getting more

23   than 17 split tablets, one consumer getting more than 17 split

24   tablets, are extremely small. No matter whose version you

25   accept, the eight parts per million or the one to two percent.

1    We, therefore, felt if you are going to claim more than that

2    amount you have to come up with something in addition to your

3    word.  And, again, we were very generous.  What we agreed to

4    was that the consumer would only have to come up with one of

5    about six or seven things, some kind of demonstration of the

6    payment or proof of a prescription or even a not from their

7    doctor.  And it doesn't have to say, "I got a split tablet."

8    The claimant has to say, "I got a split tablet," and a note

9    from the doctor saying, "I prescribed this patient Paxil CR."

10   That's it.  Very, very minimal.  And if one does that they get

11   fifty dollars plus ten dollars per split tablet on top of tier

12   one, the minimal amount.  Again, we think that is a very

13   generous, very fair way to administer this settlement.  And,

14   frankly, much more lenient than is typically done.

15        Also, with respect to notice, Your Honor, I would like

16   to second very strongly what Mr. Strange said about the notion

17   that we should subpoena pharmacies and get individual

18   information about the names and addresses of who took Paxil CR

19   from those pharmacies.  That raises a whole host of privacy

20   issues.  There is a federal statute called HIPAA -- just, I

21   mean one can imagine, if you are taking Paxil CR, which is an

22   antidepressant, you may not want someone, your local pharmacy,

23   without your knowledge providing your name and address to

24   anybody.

25        It is typically not done in these cases.  It is

1    extremely unusual.

2         THE COURT:  So what would happen is if there is a

3    subpoena or a court order, what would happen, for example --

4    let's assume this pharmacy doesn't exist -- but let's assume

5    there is a Walgreen's pharmacy at 153 Chardon Avenue, across

6    the street.  And let's assume that you get that listing from

7    that pharmacy.  Counsel would have to review it, but from that

8    listing whoever reads it you find there are 20 people who have

9    taken Paxil tablets.  Among them perhaps -- the problem is,

10   let's assume a federal judge is taking Paxil, myself.  And

11   let's assume that.  But if that is the case, when you get that

12   discovery I may not want to be a claimant in this case.

13        MR. HEROLD:  Exactly, Your Honor.

14        THE COURT:  And I don't want anybody knowing.  Of

15   course, the F.B.I. knew it when they did the check.  That may

16   be an issue.  I will put myself as an example.  It might invade

17   my privacy.  It won't become public, but it will be

18   disseminated to third parties.

19        MR. HEROLD:  That's correct, Your Honor.  Especially,

20   as Mr. Strange said, it is not a case like you have in a

21   securities case or in an antitrust case where you purchase the

22   product you are entitled to damages.  Here that is just the

23   first step.  If you purchase the product we can send you a

24   notice voiding all these privacy issues, but then you still

25   have to personally say you got a split tablet.  So it just

1    seems like A) tremendous privacy problems; b) tremendous

2    overkill in this kind of case.

3          And as the notice expert in this case we have used in

4    many cases, Cancilla, stated that the program that we had here

5    was a rigorous program; one that is of the type that is

6    routinely approved for notice to consumers in these types of

7    cases.

8          And the other point I just wanted to make on notice is

9    that there has been a complaint that the notice that went out

10   didn't adequately notify the consumers of all the details of

11   the settlement.

12         You can't do that, Your Honor.  You can't have a 30- or

13   40-page settlement agreement sent to everyone interested.  It

14   just doesn't work that way.  It is a complicated settlement

15   agreement, as they all are.  You have to come up with a notice

16   that meets the requirements of Rule 23 and due process.  The

17   notice in this case was extensive.  It had a number of Q-and-A

18   type of sections.  And, most importantly, if someone truly was

19   interested in knowing every detail of the settlement they

20   easily could have determined that.

21         How?  Number one, the settlement was posted on the web

22   site.  The web site address is all over all the notices in

23   multiple places.  All you had to do was go on the web site and

24   click the settlement agreement and you can read it to your

25   heart's content.  In fact, I shouldn't admit this, but my

1    filing system in my office leaves a lot to be desired.  Often

2    when I want to find the settlement agreement in this case I go

3    to the web site.  It takes two seconds to get to the settlement

4    agreement.  Very easy.  In the notice there are directions if

5    you want to call a number, if you have questions.  It was a

6    very comprehensive, detailed notice program.  And it's just

7    impractical to require that any notice that goes out to the

8    public would contain every single detail, you know, of a court

9    settlement agreement.

10        THE COURT:  Let me just ask what would happen if a

11   71-year-old grandmother who is computer illiterate and she just

12   watches soap operas during the afternoon and she goes to play

13   bingo.  How would that woman find out about the class action.

14        MR. HEROLD:  Well, Your Honor, that woman would find

15   out in one of the number of ways that Mr. Strange described.

16   The class -- the notice was published in multiple magazines.  I

17   don't remember, frankly, the specifics of which ones.  But

18   typically it's something like *Reader's Digest, Time Magazine*.

19   There were TV ads taken out.  And this is all figured out by

20   Cancilla who has detailed information about the demographics

21   reached by different types of magazines.  So, for example,

22   older folks might read *Readers Digest* more and, you know, other

23   people might read *Business Week.*  So they come up with a

24   program based on all those demographics designed to maximize

25   the chance that that person is going to get notice.

1    And once that person gets notice, if they want to know

2  more and they don't have a computer, all they have to do is

3  pick up the phone because all the notices, whether it is TV or

4  in a magazine provide a toll-free number for people to call and

5  ask questions.

6    And, frankly, Your Honor, that is a good example of the

7  70-year-old woman in Massachusetts.  I doubt is going to call

8  up and say, "I was thinking about this, but I want to know if

9  there is a claims-made policy in the reversion."  That is not

10  going to happen.  Those kinds of questions are questions that

11  are reviewed and asked by people who make it their business to

12  object to settlement agreements across the country and raise

13  those issues.

14    And, certainly, the proof is in the pudding.  Those

15  folks have emerged in this case and have understood basically

16  the nature of the settlement and they are here today to bring

17  up these issues, which are perfectly fine.

18    So, again, it is a balance.  If we went out there and

19  said, now, let's explain the settlement in gory detail the

20  woman in Massachusetts would be overwhelmed and wouldn't be

21  able to make any decision.  So you have to draw that balance

22  between notice that is adequate.

23    THE COURT:  And let me ask, let's assume that I approve

24  the settlement how -- and, again, that woman has not objected.

25  She doesn't know anything.  The settlement has been approved,

 1    but she is a possible claimant.  She can fill out one of these

 2    forms and get her fifty dollars or maybe one hundred fifty

 3    dollars.  How would she get notice?  She hasn't gotten it until

 4    today.  And let's assume I approve the settlement a week or 10

 5    days from now.  Is there any way she can get notice if she

 6    hasn't gotten notice thus far?

 7            MR. HEROLD:  I have to look and see how long the notice

 8    program goes.  I don't know whether it is over or it is still

 9    going.

10            The notice program goes until August 10th.  So it is

11    still going.  There are still publications out there.  The web

12    site is still up.  The toll-free number is still there.  You

13    can't have a perfect notice plan.

14            THE COURT:  I am aware of that.

15            MR. HEROLD:  But it is best tracked and so we kept the

16    notice plan going through the end of the period to cover that

17    woman in that particular situation.

18            Your Honor, that is all I have.  If you have any

19    questions I would be happy to address them.

20            THE COURT:  No.  Let's hear from Mr. Nevares.

21            MR. SALAS:  Your Honor, may I address the Court for a

22    couple of matters.

23            THE COURT:  Yes.

24            MR. SALAS:  Camilo Salas, and I was originally

25    cocounsel with Mr. Nevares representing Alma Simonet, the

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

32

1   original plaintiff in the suit that was filed here; and,

2   subsequently by way of the preliminary approval order appointed

3   by the Court as counsel for the consumer class.

4          Your Honor, I just wanted to touch on two matters that

5   I might be in a better position to discuss with the Court.

6          One is with respect to the history of this case.

7   Mr. Nevares and I investigated this case beginning in 2005 when

8   there were reports of seizure by the governmental authorities

9   here in Panama of the Paxil tablets that were --

10          THE COURT:  We are not in Panama.

11          MR. SALAS:  We are in Puerto Rico, excuse me.  That we

12   are here in Puerto Rico in the manufacturing facilities.  We

13   spent a lot of time obtaining the governmental records to learn

14   more about the case.  And, subsequently, in April of '06 after

15   doing a lot of discovery, not formal discovery, but informal

16   discovery we went ahead and filed the suit.

17          When we filed the suit GSK filed initially one motion

18   to dismiss.  The case was not in front of Your Honor at the

19   time.  It was in front of another judge.  And when Your Honor

20   became a full judge the case was transferred to you.  When we

21   amended our complaint, then the defendants filed another motion

22   to dismiss, which Your Honor took under advisement.  And, as a

23   result of which, Your Honor wrote a very lengthy opinion which,

24   quite honestly, has become very informative to us in other

25   cases because it basically discusses the law of Puerto Rico and

YVETTE RICHARDSON, CSR, RPR, CCR

1      what are the types of claims that can be brought in this

2      jurisdiction in similar cases.

3             Once Your Honor ruled in our favor there Your Honor set

4      a meeting with the magistrate judge to select the trial date

5      and discovery deadlines.  And following a meeting with the

6      magistrate judge which GSK argued that discovery should be

7      limited only to class certification issues, and what we argued

8      was that discovery should include all issues.  It was then that

9      they relented when we were about to start full discovery here

10     in Puerto Rico.  We started settlement negotiations with GSK.

11            And that brings me to the second point, which is that

12     at that point without counsel for the third-party payors; and

13     at that time we did not represent any third-party payors, and

14     third-party payors were not part of this case.  I began

15     negotiations directly with GSK and traveled to Philadelphia and

16     met with them.  Subsequently, Mr. Nevares joined me in at least

17     one meeting in Philadelphia where we discussed settlement.  And

18     subsequent to that there were several other meetings which

19     lasted -- that went on for a period of one year until a

20     settlement was finally reached.

21            During those meetings I represented the consumer class.

22     I argued on their behalf and I advocated on their behalf.  So

23     the allegations that have been made here that the consumer

24     class has not been properly represented because there has been

25     represented by lawyers who also represented third-party payors

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

34

1    is simply not true.  I have never represented third-party

2    payors.  I represented the consumer class.  I represented them

3    very well together with Mr. Nevares in all of those

4    negotiations.

5            And finally, Judge, just one thing I want to call to

6    Your Honor's attention.

7            THE COURT:  Let me just -- you are representing the

8    consumer class.

9            MR. SALAS:  Yes, I have been appointed by the Court to

10   represent the consumer class.

11           THE COURT:  Can you refresh my recollection as to who

12   represents the third-party payors.

13           MR. SALAS:  Mr. Brian Strange was appointed by the

14   Court to represent the third-party payors.

15           THE COURT:  I just wanted to get that clear for the

16   record.  Okay.

17           MR. SALAS:  Even today, as we sit here today, we are

18   together in that we represent the whole class, but we have our

19   specific instructions, if you would, to represent those

20   specific classes, and I think we have done that very well.  And

21   we have advocated for the subclasses that we really represent.

22           Your Honor, the other item was something that you just

23   asked a little while ago.  I think it is clear now, but you

24   asked whether or not notice of this hearing would have been

25   given or will be known to certain individuals.

YVETTE RICHARDSON, CSR, RPR, CCR

1          Just I call the Court's attention to paragraph 25 of

2     the original approval order where you indicated that the date

3     of the final approval hearing could be changed without further

4     notice other than which may be posted at the Court, at the

5     Court's web site and/or at the web site established under the

6     notice plan.

7          So basically there was notice there given that any

8     changes in the scheduling could be subject, could take place

9     and would be posted in the Court's own web site or whatever the

10    Court does.  That is all I have, Your Honor.  Thank you.

11         THE COURT:  Before I hear from Mr. Nevares, one last

12    thing, would there be any objection, and assuming that I

13    approve the settlement, if, for example, in the -- not only

14    the -- well, because in the web site for the settlement, for

15    example, I allow 10 more working -- until August 10th, for

16    example, to file any other objections; and that appears

17    specifically, would there be any objection as to something like

18    that?  That really doesn't change the nature of anything, but

19    it gives that little extra added window of opportunity to

20    anybody else who, you know, who specifically appeared on the

21    site.  And that is something that whoever is in charge of the

22    site could probably change right now.  Would there be any

23    objection as to that?

24         MR. SALAS:  Your Honor, would that be additional time

25    to file additional objections or to file claims?

1    THE COURT:  Objections.

2    MR. HEROLD:  Your Honor, GSK would object to that.

3  There has been quite a long time to file objections in this

4  case.  The original deadline was out there for quite a long

5  time.  The Court extended it, and I just checked.  The

6  settlement web site was updated to show the hearing date here.

7    THE COURT:  Today.

8    MR. HEROLD:  Yes, it took a little while.  I believe it

9  was done on July 17th.  It was updated, but it was updated.  As

10  Mr. Salas just stated, it's the original notice.

11    THE COURT:  You gave me that date.  I was under the

12  impression.  Because today is the 27th.  I just wanted to make

13  sure that it wasn't changed, for example, the 25th.

14    MR. HEROLD:  No.

15    THE COURT:  Or last Friday.

16    MR. HEROLD:  It was changed.  It took a while to get it

17  on the web site.  But the problem is, Your Honor, today is the

18  fairness hearing.  I think technically if the objection period

19  is extended --

20    THE COURT:  We would have to have another fairness

21  hearing.

22    MR. SALAS:  And another notice.

23    MR. HEROLD:  And there has been plenty of time to

24  object, Your Honor, as demonstrated by the fact that a number

25  of the objectors are here and the types of objections you see

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

1    here are -- I would be surprised if there are additional ones

2    that somebody comes up with.  They pretty much cover the

3    gambit.  The Court has been fair with respect to allowing

4    objections and extending the deadline.

5          THE COURT:  Let me also ask something else that is

6    related.  When was the deadline for opting out of any class?

7          MR. HEROLD:  I believe that was July --

8          MR. SALAS:  1st.

9          MR. HEROLD:  Second, was it?

10          THE COURT:  I believe no one has opted out of the

11    class.

12          MR. HEROLD:  There were a few opt outs, Your Honor, but

13    very few.

14          THE COURT:  Those haven't been filed with the Court.

15          MR. HEROLD:  No.

16          THE COURT:  Do you know how many?  10, 15 or 20?

17          MR. HEROLD:  We could find that out, Your Honor.

18          MR. STRANGE:  I think it is stated in our motion, Your

19    Honor, at the time we filed our motion for final approval I

20    think we stated the number of consumer opt outs.

21          THE COURT:  And none of those opt outs are represented

22    by any of the counsel who are objecting here today.

23          MR. HEROLD:  No, Your Honor, I believe if a consumer

24    changes to opt out they also give up the right to object

25    because they are not a part of this.

YVETTE RICHARDSON, CSR, RPR, CCR

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

38

1    THE COURT:  Perhaps somebody who opted out is

2  represented by attorney Z and attorney Z is representing

3  somebody else who objected.  I assume none of the counsel are

4  the same for objectors or people who are opting out.

5    MR. HEROLD:  Not to my knowledge, Your Honor.

6    MR. SALAS:  Their claims will not be extinguished by

7  the settlement, Judge, once they object.

8    THE COURT:  Any opt out they can't ask for the fifty

9  dollars or the one hundred fifty dollars.  They can sue and

10  they can go to any state and --

11    MR. SALAS:  And sue, yes.

12    MR. STRANGE:  Your Honor, the opt out deadline was

13  actually May 15th.

14    THE COURT:  Okay.  So that passed a long time ago.

15    MR. STRANGE:  Yeah, and there was one request from a

16  consumer to opt out at that point.

17    THE COURT:  Okay.  So only one opt out in a timely

18  manner/

19    MR. STRANGE:  For a consumer, yes, Your Honor.

20    MR. SALAS:  Thank you, Your Honor.

21    THE COURT:  Mr. Nevares.

22    MR. NEVARES:  Good afternoon, Your Honor.  My name is

23  John Nevares and I represent plaintiffs' class counsel.  Let me

24  start by saying -- by addressing an objection that has been

25  raised by Sweeney, PAL and Weinstein, which is -- which

1    involves the attorneys' fees.  These objectors cite two cases

2    in support of the fact that the attorneys' fees awarded to

3    counsel for the class should come out of the amount of claims

4    actually logged in with the claims administrator that we have,

5    you know, as part of the process.

6         The problem that these objectors have is that they

7    mislead the Court when they cite *In Re:  T.J. Companies Retail*

8    *Security,* a case from the District of Massachusetts from 2008.

9    You can find that 584 Fed. Sup. 2nd, 395.  And they also cite

10   Strong vs. Bell South Communications Inc., 173, FRD, 167, from

11   1997.

12        Those two cases are inapplicable to our case.

13        THE COURT:  Actually, in that *Strong* case there is a

14   circuit citation, 137, F.3rd, 844, 5th Circuit.

15        MR. NEVARES:  What I am trying to convey to the Court

16   is the following:  This case is totally different from the

17   factual scenario both in Strong and in *TJX.*  And I shall

18   explain to you why.

19        In this case we were able to get a common benefit fund

20   of twenty-eight million dollars in cash for the claimants, for

21   the class.  In *TJX,* for example, that was a case about the

22   hacking into a computer system and getting the credit card

23   information of about 45,000 persons.  In that case there was no

24   common fund.  And counsel used the low-start method.

25        But to make things worse, both in *TJX* and in the *Strong*

1   case that I just cited, the benefit to the class were credits,

2   benefits other than cash.   In our case the benefit to the class

3   is the recovery of what they paid for Paxil CR during the

4   period 2002 to 2005.

5        So that is why you will see when the Court writes the

6   TJX opinion saying that this 175 million fund is illusory.   And

7   you will see that when they write about *Strong* and their

8   sixty-four million dollars in credits.   This was a case

9   involving Bell South and the fact that they charged the people

10  that used telephones and certain amounts in excess of what they

11  should have charged.   And what they offered was a fund of

12  sixty-four million in credits.   And that has been referred to

13  in other cases as a phantom because the money is not there for

14  the claimant to have the incentive to go to the claims

15  administrator and collect money.

16       Here we have twenty-eight million dollars in cash for

17  this consumer class to access and get reimbursed.

18       So the judge in the *TJX* case was preoccupied with the

19  fact that he was being presented a settlement that was not fair

20  and reasonable.   And that is why you see him write, go to great

21  lengths to write about maybe in such a situation where the

22  settlement is not fair and reasonable we should adopt the

23  number of claims that are logged in in the settlement.   And

24  depending on the number of claims that are logged in, then we

25  apply a percentage to compensate attorneys.

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS
41

1          That is simply not the case before us.  In the case

2     before us we worked very hard.  And one thing counsel, my

3     brother counsel, forgot to say is that I spent four months

4     traveling the island from east to west and north to south to

5     find ex-employees of GlaxoSmithKline to find out facts about

6     their production of Paxil CR at the Cidra plant.  And that took

7     most of my time, including Saturdays and Sundays until I

8     interviewed somewhere between 20 and 30 ex-employees of

9     GlaxoSmithKline.  And that was a very important aspect of this

10    case in that the defendant was not comfortable with the fact

11    that I was doing discovery, finding out information about their

12    practices in that plant in Cidra which was eventually shut down

13    and that also brought us to settlement.

14          Now, again, not to repeat myself, but when you hear the

15    objectors come in and cite to you these two cases the TJX

16    Companies Retail Security case and the *Strong/Bellsouth*

17    *Telecommunications*, you have to understand that these are two

18    settlements with which the Court was not happy because they

19    were not reasonable and they were not fair.  Those cases have

20    been cited thereafter by circuit courts, because these are

21    district court cases, and they also repeat the same theme, that

22    the *Strong* and *TJX* cases were cases that were phantoms because

23    they were offering things that were not money.  They were

24    offering credits, you know, and other things that we are not

25    offering here.  Here we are offering cash refunds.  Strictly

1    cash refunds in a common benefit fund of twenty-eight million

2    dollars.

3          So I want you to, you know, I want to start off by

4    distinguishing these two cases from the line of cases that I am

5    going to argue to you now that sets the stage, sets what the

6    rule is in these class action cases in terms of awarding

7    attorneys' fees.  And that starts with the very well-known

8    seminal case of *Boeing vs. Van Gambert*, 444 U.S., 472, 1980.

9    In that case the Supreme Court -- the United States Supreme

10   Court held that the attorney's fees are calculated on the

11   entire fund created and not on claims made against the fund.

12         The Court is very clear and precise in its language.

13   And that is the rule that has become the common fund doctrine,

14   which is what we seek the Court to apply here.

15         If you see, for example, the case of *Williams vs.* -- I

16   think I missed a case.  If you see a very enlightening case

17   also on the common fund doctrine when awarding attorney's fees

18   in class actions it would be *Waters vs. International Precious*

19   *Metals Corporation* 190 F.3d, 1291.  That is a case out of the

20   11th Circuit which holds one thing that is noteworthy.  It

21   holds that no case has held that district court must considers

22   only actual payout, which is what these objectors are trying

23   the Court to do.

24         THE COURT:  Let me ask something, when you say they are

25   asking for actual payout, my impression is that what the

1    objection is is that the attorneys not receive the 30 percent

2    attorneys' fees.  Are the objectors requesting they only

3    receive the value of their services or what exactly?

4         MR. NEVARES:  These objectors that I just mentioned,

5    Sweeney, Weinstein and PAL are relying on those two cases I

6    just cited to you, *TJX* and *Strong*, for the proposition that we,

7    as class counsel, should collect only from those claims that

8    are actually made.  Not from the fund of 28 million dollars.

9    That is one of their objections.  And that is why I am trying

10   to explain to you that that is not -- that those two cases are

11   clearly distinguishable from the case at bar for many -- for

12   all the reasons that I have already set forth.

13        What I am doing now is taking you to the standard that

14   is -- that the majority of the circuits apply, which is Common

15   Fund Doctrine or Loadstar.

16        However, if you bear with me I will take you through

17   the case law so you will see how the Loadstar is being used by

18   the courts, the circuit courts.  The majority of the circuits

19   are going under the Common Fund Doctrine and they are using the

20   Loadstar as a collateral source to check and see whether the

21   multiplier of the Loadstar is fair enough in order to warrant

22   the award of attorneys' fees sought by the class counsel.  In

23   this case, as you know, we are seeking 8,741,329.19.  If you

24   deduct the costs, which is $159,953.90, you are left with

25   attorney fees approval sought in the amount of 8,581,375 --

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

44

1          THE COURT:  8.5 approximately.

2          MR. NEVARES:  8.5 which is 30.65 percent from the

3    common fund.  But I was going to get there in terms of

4    justifying the fairness and the reasonableness of the

5    percentage sought.  But before I do that, I want to emphasize

6    to the Court that the Common Fund Doctrine is the methodology

7    that is being applied by the circuit courts, which is a

8    percentage approved by the Court against the entire fund.

9          And that is what we are -- that is what our papers say

10   and that is what I just -- those numbers that I gave you are

11   the -- what we are seeking as compensation and the percentage.

12         Very enlightening to prove and to justify our fees is

13   the opinion by Professor Miller who has worked on class action

14   settlements for years and has made an analysis of this case,

15   which is attached as an exhibit.

16         It is the declaration of Professor Jeffrey Miller.  He

17   has spent years opining on class certification and preparing

18   databases.  He has reviewed over 1200 cases to come up with one

19   of his opinions.  This opinion by Professor Miller basically

20   justifies the amount of attorneys' fees that we seek.

21         If you go to page five he says that the Loadstar

22   multiplier in this case is 2.03.  And then says that that is on

23   the low end of all the Loadstar multipliers that he has studied

24   throughout the years from his databases.  Most of the

25   multipliers are upwards of three, four, and even five.

1       He also justifies the 30.65 percent because he has made

2    studies that appear in page 8 and page 9 of his opinion where

3    he sets forth the percentages.  If you look at page 8, for

4    example, he says, "average attorneys' fee as percentage of

5    settlement it goes into 31 -- 30, 31, 32.  And these are all

6    class actions.  All these tables deal with class actions.  And

7    he also opines that the Common Fund Doctrine is the superior

8    method of calculating the attorney's fees that should be

9    awarded to class counsel.

10       In his opinion, he says that the Loadstar approach has

11   become disfavored over time because of a number of significant

12   drawbacks relative to the percentage approach.  Among other

13   shortcomings he says is the Loadstar approach is burdensome to

14   apply, creates perverse incentives for class counsel to

15   protract the litigation, and fails to align the interests of

16   counsel with also the class.  And then he finally says, the

17   methodology of Common Fund Doctrine is a superior method for

18   validating the reasonableness of class counsel fees.

19       However, he does mention that it is a good idea to do

20   the Loadstar cross-check.  And if you look at page 12 you will

21   see that a sampling of Loadstar multipliers go from 9.3 down to

22   4.4 and we are at 2.003 in this case.  So it is more than

23   reasonable what we seek as a Loadstar cross-check or a Loadstar

24   multiplier if the Court wishes to use that as a cross-check.

25       Now, going back to my argument on the case law, I want

1    to make it abundantly clear how -- why I say that the Common

2    Fund Doctrine is the law of the land these days, and I don't

3    say it.  I mean, it started -- if you go back to 1882 you will

4    find case law that already recognizes this kind of approach.

5    But, really, the seminal case is *Boeing vs.* Van Gambert, which

6    I already cited.  But I want to take you through a couple of

7    cases that are also very important following *Boeing*.  I was in

8    *Waters vs. International Precious Metals*, 190 F.3d., 1291 from

9    the 11th Circuit.  Again, that case distinguishes *Strong* cases

10   cited by objectors at page 6 because there was no fund in

11   *Strong*, to start with, over and above the other things that i

12   already mentioned.

13        And also states -- the 11th Circuit also states, again,

14   I think I said this before, that no case has held that the

15   district court must consider only actual payout.

16        Then, I want to take you to *Williams vs. MGM Path*

17   *Communications Company* where Boeing is followed.  And there the

18   9th Circuit held that it was an error to base attorneys' fees

19   on claims against the fund, rather the entire fund or Loadstar

20   where the options given by the 9th Circuit in this case.

21        Another point that I want to bring up that this case

22   discusses, 129 F.3d, 1026, is what happens to the monies that

23    are not claimed.  Well, this case recognizes that it is that

24   those monies can be returned in this case to GSK for those

25   claimants that didn't claim out of the 28-million-dollar pot.

 1          To that effect, at page 1027, the Court citing *Boeing*

 2   states that as follows:  The Court concluded that the attorneys

 3   for successful class may recover a fee based on the entire

 4   common fund created for the class even if some members make no

 5   claims against the fund so that money remains in it that

 6   otherwise would be returned to the defendants.

 7          So I think that the argument that, you know, that money

 8   cannot be returned to the defendant fails if one reads *Williams*

 9   *vs. MGM Path Communications.*

10          THE COURT:  So even, the argument, let's assume that

11   the only person who files the form is Ms. Simonet, the

12   settlement is approved.  Then it is the same as if 300 persons

13   had filed under that case law.

14          MR. NEVARES:  Yes, because what the Courts look at is

15   the work put in by the attorneys to reach the common fund.  And

16   as you have heard here, we have gone to great lengths to reach

17   this settlement and that is the emphasis the Court makes when

18   evaluating the award of attorneys' fees for reasonableness.

19          THE COURT:  Let me ask, for instance, you mentioned the

20   Loadstar.  There is some very recent case law.  This case I

21   have before me, the highest that I have seen lately in the

22   attorneys' fees award. I will give you the name of the case

23   under the Loadstar -- I will explain to you why I am making

24   reference to this -- it is in civil case 03-2317, Perez

25   Gimenez, P.G.  It is Guillemard *vs. Contreras* case.  That is a

1   civil rights case.  One plaintiff vs. one defendant in personal

2   and official capacity.  It is three plaintiffs, but the

3   plaintiff's company, the plaintiff's wife, vs. one defendant or

4   the personal capacity under 1983 and then the Commonwealth or

5   the same party in the official capacity for injunctive relief

6   purposes.

7          That case went to trial.  Went up on appeal and

8   interlocutory.  And attorneys' fees under the Loadstar.  And

9   again, it was complex I think because -- it wasn't complex, but

10  it was protracted litigation because I think the defense

11  litigated this case very highly.  But the total attorneys' fees

12  awarded in that case were 1,525,000 -- no, about one million

13  and a half.  And that is a simple political discrimination case

14  that took some time to be tried.

15         What I would like to ask, just to get an idea, because

16  this is a compared to -- if this case went to trial, if this

17  type of case went to trial -- that case went to trial, if this

18  case were to go to trial, I assume that even under Loadstar

19  conceivably and let's assume it goes to trial, gets appealed

20  and is affirmed on appeal, but with all the attorneys' fees it

21  is not unreasonable, and this is obviously a case where you are

22  going to need more than this political discrimination case.

23  There were three attorneys working for the plaintiffs and they

24  were approved by the Court.  Assuming if this case were to go

25  to court GlaxoSmithKline would not only have counsel here

1      present, but would have two or three attorneys; am I correct?

2      It would be a litigation.

3            MR. HEROLD:  I'm afraid you're right, Your Honor.

4            THE COURT:  And you would have your appellate attorney

5      also sitting in the back row.  I would assume we would have

6      here Mr. Nevares, Mr. Strange and Mr. Salas and, perhaps, one

7      or two other counsel.  But if this case were to go to trial,

8      and I assume this with all the causation and all the experts,

9      probably we would have a couple of Daubert hearings; but if

10     this case were to go to trial, I think at least from the -- if

11     plaintiffs were to prevail, and obviously, this is not 1983.

12     So it is not automatic attorneys' fees, but based on if we look

13     at the Loadstar, and if the attorneys' fees were available, I

14     would assume we are talking about maybe in the neighborhood of

15     anywhere within a reasonableness from anywhere from three to

16     6.5.  It could be 7 million dollars in attorneys' fees because

17     of the class issue.  Of course, we would have to have the Court

18     certify the class if that got litigated.  We could be here in

19     this case maybe six years or five years easily.  Even though on

20     rocket docket this would not be -- as the motion to dismiss,

21     the Court's ruling in this case denying the motion to dismiss

22     in part and granting in part, it is not a simple case.

23            I would assume, and based on my experience, this is a

24     case that could generate, again, anywhere from three to six,

25     maybe even more, million dollars.  And some of the rates I will

1   just quote briefly from the Guillemard case.  But, for example,

2   and actually that case mentions Mr. Nevares because he has

3   tried other cases here.  So let me just for example cite

4   Mr. Nevares' -- this is at page 11 of docket 556.  This is

5   amended order awarding attorneys fees.  It is a very thorough

6   opinion.  It rates attorneys' rates throughout the years, but

7   for example, this is a case called Sueiro Vazquez where

8   attorney Nevares worked.

9          MR. NEVARES:  I remember that case.

10         THE COURT:  In that case Mr. Nevares, based on his

11   experience, and he has been an attorney since approximately

12   1980, it is almost 30 years of experience, but he was awarded,

13   this was maybe three or four years ago, maybe even more, 265

14   for out-of-court work, 285 for in-court work.  So I would

15   assume that -- when was that case, Mr. Nevares, do you

16   remember?

17         MR. NEVARES:  Yes, I remember that case very well.

18   That involved the Historic Preservation Society and I

19   represented two public officials that had been dismissed for

20   political reasons.

21         THE COURT:  When was that?  One was in 2001/2002.

22         MR. NEVARES:  I believe it was -- I mean, I have tried

23   so many case it is hard to pin it down.  But I believe it was

24   sometime in 2002, or 2003 that we actually tried the case

25   before Judge Garcia.  And it was appealed.

**06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS**
51

1   THE COURT:  Let's assume Mr. Nevares' rates for Puerto

2   Rico, 300 now and 320 or 325 for in-court now.  Mr. Salas, you

3   appeared before me.  I assume you are basically in that same

4   boat.

5   MR. SALAS:  Actually Judge, we are a little bit higher.

6   Our rent is higher down in New Orleans.

7   THE COURT:  But you have been practicing for the same

8   time as Mr. John Nevares, Mr. Salas.  The Court knows.  We have

9   done a lot of cases together.

10   Since you are out of state that might be justified and

11   I believe -- Mr. Strange, how many years of experience do you

12   have?

13   MR. STRANGE:  I have been practicing since 1981 also.

14   THE COURT:  All of you have approximately 30 years

15   approximately.  But out-of-court counsel -- out-of-state

16   counsel would probably be awarded a higher award.  I am not in

17   agreement with that, but I think it discriminates against local

18   counsel, but I think sometimes you need out-of-state counsel as

19   well, and usually the rates are going to be higher as happened

20   in the Guillemard case.  The counsel from Massachusetts was

21   awarded a higher rate.

22   This is a case that would take three or four counsel on

23   plaintiff's side.  And that case, again, if we would have to

24   have the class action, I am sure there would be the class

25   action hearing.  There would be numerous, I would say, I would

YVETTE RICHARDSON, CSR, RPR, CCR

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

52

1   use the word Solomon Grundy of discovery issues before

2   magistrate judges and myself.  Then there is a Rule 56 stage of

3   the case.  And I am sure summary judgment motions would

4   probably be, if I would pile them up, the plaintiffs and the

5   defendants, they would probably be with the exhibits taller

6   than me.  Probably taller than Yao Ming so we would have a lot

7   of exhibits.

8          If that would be the case, summary judgment, assuming

9   the case would go to trial, you can give me a rough estimate,

10  two or three months.

11          MR. NEVARES:  Easily.

12          THE COURT:  Counsel, if you are going to object you may

13  say it won't take that long.  Assuming the case went all the

14  way.  So under a Loadstar -- again, this is just an

15  approximation, because hopefully, as I hope, I don't have to

16  try this case.  If there are any objectors in Puerto Rico I

17  hope they end up somewhere else except in the courtroom.  With

18  one single plaintiff this could take a long time to get tried.

19          With the Daubert hearings which would probably be as

20  lengthy as the trial.  They could be dispositive, but if the

21  Court were to rule in plaintiff's favor and, again, there may

22  be cross Daubert hearings.  I am sure the plaintiffs would try

23  to strike the defense experts and vice versa.

24          So, again, this is a case that conceivably we could

25  have three million dollars in attorneys' fees.  Under Loadstar

1    it could be five million.  It could be six.  It would all

2    depend.  But, again, within the range or the realm of

3    reasonableness it could be within that range.  I just wanted to

4    note that.

5         Okay.  Mr. Nevares, you may continue.

6         MR. NEVARES:  Yes, continuing, I couldn't agree with

7    you more in terms of your exposition, Your Honor.

8         THE COURT:  Again, I base that based on I was a

9    magistrate judge for five years and a district court judge for

10   three years now, almost three years and about a week.  That is

11   my professional estimate of what this litigation could cost in

12   Loadstar.  And I assume counsel for Glaxo, if you were to bill

13   your clients, it is very -- we know from that perspective this

14   could probably cost somewhere in that ballpark of attorneys'

15   fees as well.  Am I correct?

16        MR. HEROLD:  I'm afraid to answer, but I think you are

17   correct, Your Honor, at least.

18        THE COURT:  And then, of course, you could have other

19   fee arrangements.  Let's assume a different law firm were to

20   try this or handle this.  It could run up to that range, a

21   similar class action.

22        Let's continue, Mr. Nevares.

23        MR. NEVARES:  I want to cite to you a case that where I

24   was counsel in my early days.  It was the Dupont fire class

25   action.  In that case there were opinions issued by the 1st

YVETTE RICHARDSON, CSR, RPR, CCR

1    Circuit Court of Appeals pertaining to attorneys' fees.  I am

2    referring to 56 F.3d, 295.  And noteworthy is the fact that the

3    1st Circuit stated that and I cite, temporary to -- and this is

4    a 1995 case, contrary to popular belief it is the Loadstar

5    method, not the POF method that breaks from precedent.

6    Traditionally counsel fees in common fund cases were computed

7    as a percentage of the fund subject, of course, to

8    consideration of reasonableness.  And it cites a case from the

9    United States Supreme Court, *Central Railroad and Banking*

10   *Company vs. Pettus*, 113 U.S. 116, at page 127 and 128 from

11   1885.  That is why I mentioned earlier that this doctrine goes

12   back to the 19th Century.  It is basically written, as you say,

13   Your Honor, in New Hampshire granite.

14        Let me turn to other issues that have been raised

15   because I think I made my point as to what methodology

16   computing attorneys fees should be.  There are other cases I

17   can cite to you from other circuits or if you wish I can

18   discuss those with you.

19        THE COURT:  It is not necessary.  And let me say this,

20   this might save time for everybody and objecting counsel may

21   argue otherwise.  But, again, I understand that even if we were

22   to use the Loadstar fee, the attorney fee here is not, per se,

23   unreasonable had this case proceeded all the way.  That's my

24   finding, based on my experience.

25        So, again, that may save everybody some time.  You may

1    argue that I am wrong.  I am sure Mr. Nevares is not going to

2    argue that.  I am sure Mr. Nevares is not going to argue that.

3    My feeling is I may disagree and perhaps I may say it should be

4    7 million rather than 8.5, but, again, it is not outside the

5    range of reasonableness of the Court's experience had this case

6    gone all the way and applied the Loadstar method.

7             MR. NEVARES:  I also want to point out, one of the

8    objectors cites the case of Weinberger vs. Great Northerner,

9    925 F.2nd at 518 from the 1st Circuit in support of his

10   position that there has to be an itemization of all the tasks

11   performed by counsel.  The problem Mr. Weinstein has is that

12   case is not applicable to the case at bar.  That case involved

13   attorneys fees, to the attorneys' fees made in conjunction with

14   voluntary discontinuance of a class action suit under

15   circumstances where there was no common fund.  And fees were to

16   be paid out of a clear sailing agreement.  So that case is

17   simply again, just like *Strong* and *TJX,* not applicable to the

18   case at bar because of the circumstances that I just pointed

19   out.

20            Your Honor had discussed hourly rates.  I had case law

21   on hourly rates on *Love vs. Mayo* on Sunday, Westlaw 2709975

22   from 2007 the Court approves hourly rates in a class action

23   suit between 305 and 690 dollars and 245 dollars for

24   paralegals.  If you look at In Re: Priceline 2007, Westlaw

25   2111592, The award of attorneys' fees totals 30 percent of an

1   80 million settlement and approves the Loadstar cross-check.

2   And the hourly rate there is a range from 50 dollars to 770

3   dollars per hour.  Do you have any questions, Your Honor?

4           THE COURT:  I don't have any questions.  Again, the

5   Loadstar here for Puerto Rico, Mr. Nevares, you are one of the

6   highest attorneys in this Court, based on your experience and

7   the civil rights case and litigation.  I am talking three or

8   four years ago you were 285 in court and 265.  So you are

9   probably, again, 300 or 325 in court, 300 out of court.  And

10  out-of-state attorneys, they would be making at least that much

11  or maybe a little bit more in their respective jurisdictions.

12  But even if we apply it within Puerto Rico you are all within

13  that range.

14          I would have to know, Mr. Strange, obviously for this

15  type of class action litigation, particularly for the

16  procedural and the other very technical matters, he is very

17  experienced also, and that could weigh out because of his

18  expertise.  I don't think anybody here in Puerto Rico in all

19  these class action cases there are usually counsel from

20  outside.  So he would probably be compensated more.

21          So, again, my finding is based on the Loadstar, it is

22  within the range of reasonableness.

23          MR. NEVARES:  Anything further, Your Honor?

24          THE COURT:  Nothing further.

25          MR. NEVARES:  Thank you, Your Honor, for your time.

                    YVETTE RICHARDSON, CSR, RPR, CCR

1          Let me hear from counsel for GSK, if there is anything

2     you wish to add.  If not, I will start hearing from objecting

3     counsel.

4          MR. HEROLD:  No, Your Honor.  GSK has agreed not to

5     object to the request.

6          THE COURT:  Okay.

7          Let me ask one additional thing before I hear the

8     objections and either side and then the objectors can also

9     address this.  I know there is the cy pres issue here.  C-Y,

10    separate word, P-R-E-S, and that means that whatever funds are

11    not collected or presented funds that are not collected go to a

12    nonprofit that deals with the issue.

13         My question is just to get it on the record, let's

14    assume only Ms. Simonet fills out the form.  Attorneys collect

15    their 8.5 million.  There is still 20 million there left in the

16    pot.  Do those 20 million -- are those 20 million under the cy

17    pres doctrine or is it just a percentage?

18         MR. STRANGE:  Your Honor, Brian Strange for the record.

19    The way the settlement works, with respect to the third-party

20    payors there is 11.2 million dollars in cash.  That money is

21    distributed pro rata to the third-party payors.

22         THE COURT:  You know who those are.

23         MR. STRANGE:  We know who those are.

24         THE COURT:  There is no reversion.

25         MR. STRANGE:  There is no reversion.

06CV1230 — **ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE** — FAIRNESS
58

1          THE COURT:  So that means there is 8,000 -- I mean,

2     eight million or nine million dollars for the individual

3     claimants.

4          MR. STRANGE:  For the third-party payors, yes, and then

5     there is 16.8 allocated for the consumers.  And after the

6     subtraction of the notice, cost, administration and the

7     attorneys' fees the amount of consumer claims are paid and

8     there won't be any money left over because that is a

9     claims-made policy.  GSK has agreed to pay up to 16.8 million

10    for the consumers plus the percentage of the notice,

11    administration and attorneys' fees.

12         THE COURT:  But only if Ms. Simonet requests her 50

13    dollars or her 150 dollars, would that whole money go to the cy

14    pres or what happens.

15         MR. STRANGE:  With respect to the 16.8 million normally

16    a cy pres would work if there is a cash, you know, if there is

17    16.8 million, and not that many people claim there is an amount

18    of money that could go to a charity under one version of a

19    settlement.  This version is it goes back to GSK.  GSK is not

20    going to get 16.8 million.  Assuming Your Honor approves the

21    attorneys' fees, let's say for example, it is 8.5 million, 60

22    percent of that comes out of the 16.8.  So that is,

23    approximately, you know whatever, five million.  Then costs of

24    notice comes out of that.  Six percent of the cost of the

25    notice and the administration come out of that.  So even if

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

59

1    only a few people claimed then instead of spending 16.8

2    million, GSK would spend, you know, would take 6.8 million.

3              THE COURT:  Let me ask, there is a consumer class and

4    then there is third-party payor.  Let's assume the attorneys'

5    fees are 8.5 million, would that mean that half of those

6    attorneys fees come from one group, the other half from the

7    third party or the other half from consumers or how is that?

8              MR. STRANGE:  That is divided 40 percent to the

9    third-party payors and 60 percent to the consumers because the

10   28 million is divided 60 percent to the consumers and 40

11   percent.

12             THE COURT:  So the actual amount that could be reverted

13   to GSK could be approximately 10 or 11 million.

14             MR. STRANGE:  Yes, it could be around that amount.

15             MR. HEROLD:  Your Honor, just tipping the point even

16   sharper.  It is really not a reversion.  A reversion incurs

17   where if we put aside the third-party payor for a second.  On

18   the consumer side, it would be a reversion deal if 16.8 million

19   was actually put in an escrow account.  And then the money came

20   out to pay attorneys' fees, administrative costs and claims and

21   the GSK would get what's left.

22             The way this settlement is structured it is the same

23   way the Hormon settlement was structured.  GSK has agreed to

24   pay up to 16.8 million for the consumer side, but it doesn't

25   actually pay it unless --

1          THE COURT:  Unless it is requested.

2          MR. HEROLD:  If it is not --

3          THE COURT:  If it is not requested then GSK.

4          MR. HEROLD:  Just doesn't pay it.

5          THE COURT:  Just doesn't pay it.

6          MR. HEROLD:  Exactly.  So this notion of a cy pres

7    would change considerably and require GSK to take money out of

8    its pocket, it doesn't anticipate having to pay unless the

9    amount of consumer claims are much higher than we think it will

10   be, and putting it in some charity.  There was some confusion

11   in the papers about that, Your Honor, so I wanted to straighten

12   that out.

13         THE COURT:  I wanted it to be clear that there is no cy

14   pres here.  The money is in GSK's hands unless X number of

15   claimants claim it and that is where it leaves.

16         MR. HEROLD:  Correct, Your Honor.

17         THE COURT:  For the consumer, because for third-party

18   claimants, they are going to get it.

19         MR. HEROLD:  Correct.

20         THE COURT:  Okay.  Now I am going to hear from the

21   objectors.  Let me just see a showing of hands from the

22   objectors.  What objectors are here for the consumers and which

23   are here for third-party payors.

24         MR. WEINSTEIN:  Your Honor, Jeff Weinstein on behalf of

25   Clay Bain, and he is a consumer.

YVETTE RICHARDSON, CSR, RPR, CCR

 1          MR. WILKINSON:  Actually, Your Honor, Wells Wilkinson

 2   for PAL.  We did raise issues that are relevant to the third-

 3   party payors subclass in the settlement.  We acknowledge that

 4   we do not have standing in that we are not here on behalf of

 5   one of those third-party payors, but we do feel that under

 6   existing law the Court can certainly consider all our comments.

 7   We would like to share them with you even if another party

 8   here, a class member, is not present.  We would be happy to

 9   describe it.

10          THE COURT:  There is nobody here for a third-party

11   payor.  Of the other objectors that are in writing, it is all

12   class.  Class members.

13          MR. WEINSTEIN:  Consumer class only.

14          THE COURT:  What I would like to do also, I am going to

15   hear from the objectors, but if one objector raises a point I

16   would appreciate it if the next objector, if someone has said

17   that before just say that I join.  What is good for the goose

18   is good for the gander.  Whatever he says will benefit everyone

19   else.  Just say you incorporate any of the other comments and

20   just add anything that is original that hasn't been raised

21   before, and that way we will save everybody time.

22          So, Counsel, you may proceed.

23          MR. WEINSTEIN:  May it please the Court, Your Honor, I

24   will be brief.  As much as I have enjoyed my stay in Puerto

25   Rico, I have a flight to catch.

                    YVETTE RICHARDSON, CSR, RPR, CCR

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS
1        THE COURT:  Okay.

2        MR. WEINSTEIN:  Thank you very much.  My name is Jeff

3   Weinstein.

4        THE COURT:  I assume that is your luggage there.

5        MR. WEINSTEIN:  That is Mr. Brown's luggage.  My

6   luggage is back at the hotel.

7        THE COURT:  Okay.

8        MR. WEINSTEIN:  Thank you very much.  Jeff Weinstein,

9   on behalf of Clay Bain.  As I mentioned before, Mr. Brown is

10  our local counsel.  Thank you for allowing me to represent pro

11  hac vice.  I refer the Court to objections to certification,

12  the settlement the request for attorneys' fees already on file.

13  That is docket at 130.  The Court has just hit the nail on the

14  head.  To consumers this settlement is illusory because there

15  will not be many consumers that make a claim.

16       So I would like to discuss my comments solely on the

17  policy reasons why it is in the best interest of consumers that

18  the Court should base the percentage of the fund of the amount

19  of attorneys' fees on the amount actually claimed by class

20  members, not on some hypothetical amount as requested by class

21  counsel.

22       THE COURT:  Let me just ask you one thing, because when

23  you talk, "class members," that's maybe four million dollars in

24  attorneys' fees for class members.  Because the other four

25  million are for the third-party payors.

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

63

1       MR. WEINSTEIN:  Your Honor, as I understand it, counsel

2   can probably speak to the numbers more than I.  We have a 60/40

3   split.  We have a 60 percent split for consumers.

4       THE COURT:  60 percent for the consumers.  We are

5   talking about the 60 percent for the consumers.

6       MR. WEINSTEIN:  So whatever the amount the Court

7   believes to be a reasonable amount of the attorneys' fees, my

8   request is that the Court wait until after the claim period

9   ends on August 10 to see what the take rate is for consumers.

10      So I understand the argument that counsel has made

11  about a common fund.  I am requesting, as a matter of policy,

12  Your Honor, that what is fair for the class members is that we

13  wait and see, if the Court wouldn't mind, it is not a very long

14  period of time, until August the 10th to see how many actual

15  consumers make claims.

16      THE COURT:  And let me just ask, if anybody has a rough

17  estimate, how many actual consumers have made claims up to now,

18  if somebody knows.  If you have an idea.

19      MR. STRANGE:  Your Honor, I think we don't know up to

20  now.  I think up until July 1st, there was 115,000 hits to the

21  web site, according to the declaration.  And I think, I don't

22  have the exact numbers, but something like requested at that

23  point 10,000 claims sent out, but I am not positive about that.

24      THE COURT:  Okay.  And that is not, I assume

25  Ms. Simonet has filed her claim.

YVETTE RICHARDSON, CSR, RPR, CCR

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

1        MR. INSERNI:  Yes, Your Honor.

2        THE COURT:  Please continue.

3        MR. WEINSTEIN:  I am not a mathematician.

4        THE COURT:  Neither am I.

5        MR. WEINSTEIN:  But here we have the defendant, and I

6    am going to go off my script for just a moment, because I

7    believe you raise an important point.  Here we have the

8    defendant saying there should be 5,600 claimants, but roughly

9    we have 10,000 people making claims that have signed an

10   affidavit swearing they have potentially perjured themselves,

11   it may not be practical at all for them to have a valid claim.

12   I think the numbers will speak for themselves as they come in.

13   But, remember, claimants are signing under oath swearing that

14   they are telling the truth, under penalty of perjury.

15        Yet if the numbers bear out, as they have been

16   discussed in this courtroom, it would be impossible for there

17   to be more than 5,600 claims or something to that order.

18   Again, I am off script.  If the take rate is more than two or

19   three percent, Your Honor, of the entire country, I will be

20   surprised.

21        THE COURT:  You could have approximately 10,000 by now.

22   The time they have had, by August 10 it could be up to 20 or 25

23   at the most.  Anywhere between 18,000 and 25, that may be it.

24   And, again, you never know.

25        MR. WEINSTEIN:  I would be very surprised.  I would be

1    willing to place a wager at one of the local casinos that the

2    take rate would be substantially less than the numbers have

3    just now been discussed.  Probably more or less in the 150 to

4    the 200 range.

5         As the Court is well aware there is a potential

6    conflict between class counsel and class members in any class

7    action settlement.

8         The defendant is willing to settle for some amount.

9    Here somewhat illusory because it is not real money.  It is

10   claims made.  And it has little interest in how that money is

11   divided between counsel and the class.  Class counsel, of

12   course, has an interest in maximizing their fees.  Nothing

13   wrong with that.  We are all trying to make a living.  The

14   class has an interest in maximizing the fees so as to maximize

15   their share of the settlement fund, which is obviously in the

16   best interest of claimants.

17        The problem is that only the class counsel and

18   defendant are at the settlement table.  Thus, there is a risk

19   that class counsel would create an artificially high settlement

20   fund with a difficult claims process, signing something under

21   oath, under penalty of perjury to maximize their fees.

22        For instance, if the defendant were willing to spend 10

23   million to settle the case there is two options.  One would be

24   to create a 10-million-dollar fund, reduced by, say, three

25   million dollars in fees and guarantee that the remaining seven

1  million goes to the class members or cy pres. We don't have cy

2  pres here.

3       Option two would be to create a 20-million-dollar fund

4  less six million dollars in fees, but set up notice and claims

5  process that the parties believe will result in two million

6  dollars in claims. Option two is better for both the defendant

7  who now only pays eight million and the class counsel who

8  doubles their fee.

9       The class loses under option two because they receive

10 only two million rather than seven million. Since only the

11 defendant and class counsel are at the settlement table there

12 is an incentive to go with option two.

13      The best way that I would propose, Your Honor, to

14 protect the class, therefore, is to tie the fees to the amount

15 actually received by the class either directly or through a cy

16 pres. That creates an incentive for class counsel to maximize

17 the actual recovery of class members.

18      In our supplemental objection we cited the Court to the

19 statement of Justice O'Connor respecting the denial of the

20 petition for a writ of certiorari in *International Precious*

21 *Metals Corp. vs. Waters.* That is a case that Mr. Nevares

22 stated several times. I have a different cite because I am

23 using the Supreme Court cite which is 530 U.S. 1223, 2000((.

24 Justice O'Connor cited several reasons for limiting fees to an

25 amount claimed. First, she points out that, setting fees on a

1    hypothetical settlement fund amount will "Decouple class

2    counsel's financial incentives from those of the class;

3    increasing the risk that the actual distribution would be

4    misallocated between the attorneys' fees and the plaintiff's

5    recovery."

6          Second, she points out that using the hypothetical

7    benefits "Potentially undermines the underlying purposes of

8    class actions by providing defendants with a powerful means to

9    enticing class counsel to settle lawsuits in a manner

10   detrimental to the class."

11         Your Honor, the Court here can easily protect the

12   interest of the class by waiting just two or three weeks to see

13   the actual claims made in this case because the deadline is

14   August the 10th.  Then the Court will know what actual benefit

15   class counsel obtained for the class.  Then, to be fair for

16   everyone involved in this process, the Court certainly will

17   award an attorney -- a reasonable percentage of that amount as

18   attorneys' fees.

19         Your Honor, in sum, we urge the Court to disapprove

20   this settlement.  But if the Court approves the settlement we

21   urge the Court to deny the request for attorneys' fees or to

22   delay the request until the Court has an opportunity to

23   actually see how many folks made claims.

24         Your Honor, thank you very much.

25         THE COURT:  Let me ask one question.  Let's assume I

1   wait until the August 10 deadline.  There is only 10,000 or

2   let's assume the estimate is even lower.  It is 8,000.  My

3   question is if Ms. Simonet and, again, this has been -- let's

4   assume this has been just a Puerto Rico class action within

5   Puerto Rico.  If this case were to go to trial, even with the

6   local class action, and when I say local, I mean residents of

7   Puerto Rico, I am not just applying Puerto Rico law, but if

8   this case were to go to trial given the Daubert and all the

9   motions, summary judgment discovery, and all the hearings that

10   we would have with certification, going to trial, two or three

11   months, again, this is not just a simple case.  Under Loadstar

12   and, again, the fees that I have talked about and, again, in

13   civil rights cases which are much easier than this to try and

14   don't involve Daubert motions or complicated discovery such as

15   this, the fees here could be conceivably, as I stated,

16   anywhere -- it could be in the couple of millions.

17        So, you know, do you have anything to say about that?

18        MR. WEINSTEIN:  Your Honor, I was told about you to be

19   direct.  So I will try to answer your question directly.  The

20   fees could be zero because the plaintiffs may not prevail.

21        THE COURT:  That is also true.  If they don't prevail.

22   Again, this is not a 1983 case.

23        MR. WEINSTEIN:  I have some horrible cases in my office

24   that we have taken depositions in.  The parties in this case

25   have not taken one deposition yet.  I understand that there

1    could be tremendous fees.  I am not familiar enough with Puerto

2    Rico, Your Honor, to discuss what could potentially happen

3    here.  I can tell you in the 5th Circuit this case would

4    already be over because it could not have been approved as a

5    class action settlement, in my opinion, I don't think because

6    it is, the 5th Circuit sits in New Orleans.  So we have better

7    comments from class counsel.

8         If a Loadstar was decided in the 5th Circuit class

9    counsel would be lucky to see a 1, 2 to a 1.5 multiplier on the

10   Loadstar.  This is what in my opinion give class actions a bad

11   name.  People see notices about the class.  They register for

12   the class.  Then, for whatever reason, they may or may not get

13   a benefit.  But when they get 50 dollars and only 200 people or

14   so make a claim and get 50 dollars and class counsel gets nine

15   million dollars, that destroys the process and it sets a bad

16   precedent for other cases.

17        All I am asking for the Court to do is, as a matter of

18   fairness and policy, to see how many claims are made to

19   justify, not disputing hard work, Your Honor, but to justify

20   the amount.

21        THE COURT:  Let me say this, what I am going to do is

22   I'll wait until August 10th.  That may very well justify that

23   they maintain the settlement as it is.

24        MR. WEINSTEIN:  Yes, Your Honor.  Clearly within your

25   discretion.  The best time to be a federal judge.

1           THE COURT:  What jurisdiction are you from?

2           MR. WEINSTEIN:  I am from Texas, Your Honor.

3           THE COURT:  You are from Texas.  Okay.

4           MR. WEINSTEIN:  And, by the way, thank you very much.

5    This is the first time I ever practiced law outside the

6    continental United States.  It is actually every exciting.

7    Even though I have been practicing law as long as these guys,

8    they are much better preserved than I am.

9           MR. SALAS:  It is the warm weather in Puerto Rico.

10          THE COURT:  Come more frequently.  Mr. Salas has been

11   coming here for a couple of years.

12          Thank you very much.  I appreciate it.  I know you have

13   to catch a plane.  Are you flying to Houston or Dallas?

14          MR. WEINSTEIN:  I have a meeting in Washington, D.C.

15          THE COURT:  You are taking the Baltimore flight.

16          MR. WEINSTEIN:  Would it be okay to be excused now?

17          THE COURT:  You are excused and your driver is excused.

18   Very well.

19          Goodbye, Mr. Brown.

20          Okay.  Mr. Inserni, are you going to be brief?

21          MR. INSERNI:  Very, Your Honor.  I am here as local

22   counsel.  I was just asked to reiterate what is in writing by

23   attorney Pentz.

24          THE COURT:  And before counsel leaves, what I will do

25   is I am not going to issue a ruling on this.  I am going to

                    YVETTE RICHARDSON, CSR, RPR, CCR

1  sleep on it.  And I will be issuing a ruling within the next

2  couple of days.  I may wait until August 10th.  But I am not

3  going to issue it today or tomorrow.  I am going to sleep on it

4  and give it careful thought.

5          Thank you.

6          MR. INSERNI:  Your Honor, I am just reiterating what's

7  in writing.  I have really nothing more to add.  I would like

8  to make clear for the record that I have been in practice more

9  or less for the same amount of time as Mr. Nevares and Mr.

10  Salas and I have no doubt whatsoever of their efforts.  But I

11  am here representing an attorney.  I am here as local counsel.

12  I am here, you know, I submit on his behalf what is in writing.

13  And I really should not add anything else.

14          THE COURT:  So you are not adding anything else.

15          MR. INSERNI:  Right.  And permission to withdraw.

16          THE COURT:  Granted.  You are excused as well.  And you

17  adopt any arguments.

18          MR. INSERNI:  That's correct.

19          THE COURT:  Madame.

20          MS. BONILLA:  Michelle Bonilla Sotomayor.  I am also

21  local counsel for William and Kathleen McWhorter and Susan

22  Colvin, and we basically rest on our papers and adopt all

23  statements that are not inconsistent with our papers.

24          THE COURT:  Okay.  Thank you.  Last, but not least.

25          MR. WILKINSON:  Thank you, Your Honor.  Wells Wilkinson

1    from Prescription Access Litigation here on behalf of objector,

2    Diane M. Fox.  You haven't asked me if I will be brief, I will

3    try, but I can't promise.  I do have a plane to catch myself.

4            THE COURT:  Take your time.  Where is Ms. Fox from?

5            MR. WILKINSON:  Ms. Fox currently lives in Washington

6    state.

7            MR. STRANGE:  She lives in Portland, Oregon according

8    to her affidavit.

9            MR. WILKINSON:  Portland, Oregon.  I am sorry.

10           THE COURT:  That is close by.

11           MR. WILKINSON:  By way of introduction, I would like to

12   actually just state for the record, the organization that I

13   work for is called Prescription Access Litigation.  We are a

14   nonprofit organization that was formed in 2001 to try to bring

15   consumers, unions and senior organizations into the process of

16   using litigation to try to effect change in the prescription

17   drug industry.

18           And, unlike my learned brother, I haven't known any of

19   the attorneys in this case before today.  We did object to two

20   of the prior Paxil cases in 2006 and 2008.  But we worked with

21   different attorneys.  Since I wasn't even aware actually that

22   the counsel here were the same counsel as were in that case.

23   So our organization is involved in these cases.  We primarily

24   bring them or assist the involvement of consumer-oriented

25   groups to try to bring these cases and to try to maximize the

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

73

1    benefits and the impact for consumers.  So that is our

2    interest.

3           You know, we are not -- we don't consider ourselves

4    professional objectors, but we do consider ourselves

5    professionals in this area.  And the two prior objections,

6    Counsel Strange mentioned in the two other Paxil cases, the one

7    in 2006 that dealt with consumers, we actually had a number of

8    points that we raised there that were overruled.  But some of

9    them were actually adopted by the Court at that time as well.

10          And then our objection to the Nichols case in Minnesota

11   in 2008 was actually something where we negotiated amendments

12   to the settlement before the date of the final hearing such

13   that we were happy to withdraw our objection.

14          So there are four or five points that I want to raise

15   today about our concerns about this settlement.  So we can

16   start with the notice which we feel has been inadequate

17   generally and is markedly deficient in three specific ways.

18          Our understanding is, and our experience, is that

19   publication notice is no longer adequate because their means of

20   identifying potential class members in these consumer drug

21   cases.

22          And we would prefer to see some process to allow direct

23   mail notice or, if possible, even preferred some kind of direct

24   mailing of checks or claims to the members of the class.

25          THE COURT:  Let me ask, how can that be accomplished

1    here because here the problem, and I have been within a class

2    for securities litigation.  All of a sudden I receive a seven-

3    dollar check six years later.  But my address is here and that

4    is six years later.  We have the HIPAA law here.  How can they

5    send the direct notices to everybody?  That is one big hurdle.

6         MR. WILKINSON:  It definitely is a hurdle, but it is a

7    hurdle that has been overcome by class counsel in other cases.

8    There are currently two cases that have received preliminary

9    approval and their final approval is pending, but it actually

10   has been supported by their assurances to the Court that they

11   are going to use subpoenas to the large chain pharmacies and

12   also to the large mail order pharmacies to gather the names of

13   consumers and then treat them in a HIPAA-compliant way with a

14   third-party administrator or with the Court to identify who

15   these consumers are.  And I believe in both these cases there

16   are proposals to mail them checks or to mail them claims.

17        So one case is called In Re:  Average Wholesale Price

18   Litigation.  We cited it in our brief.  Another is the First

19   Databank McKesson band litigation going on in the district

20   court in Boston.  I believe that is cited in our brief, but I

21   can give you a cite to that as well.  There is a way to do this

22   HIPAA compliant.

23        THE COURT:  You say it might be HIPAA compliant, but

24   what about the person who, and there may be many persons who

25   decide, I don't even want to receive a check.  I don't want to

1    make a claim because I would rather maintain my full HIPAA

2    rights, my right of privacy.  And let's assume that the federal

3    judge, I'll make this claim, I am not taking or I have never

4    taken Paxil, not yet.  Sometimes I might think about it, but

5    let's assume, for example, that, you know, or maybe I don't

6    want anybody knowing that.  I have that right to privacy.

7    Let's assume that somebody else, a reknown attorney, someone

8    who is running for political office who took Paxil within a

9    particular time and no longer suffers from depression or

10   needs -- there might be many other.  There may be many other

11   examples, but there may be many other persons for 50 or 150

12   dollars, even if it were higher, would rather not collect any

13   money.  That is a concern I have.  How do I protect those

14   persons?

15          Here we are dealing with, this is diversity action

16   here.  It is not a federal claim.  And we are applying Puerto

17   Rico law.  And if we are applying Puerto Rico law, under Puerto

18   Rico law, under the Puerto Rico Constitution there is a right

19   to privacy that goes even beyond the federal constitutional

20   right, the Constitution here is overprotective.  And that's a

21   concern I would also have about, you know, these persons, that

22   their rights, you know, as a class or possible class members

23   could be violated by trying to reach other class members.  So

24   that is another concern that I have that, perhaps, in another

25   state might not apply.

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

1    Don't blame me.  Blame whoever whoever wrote the

2    Constitution.  Actually, Congress approved it.  But, again,

3    that's one claim.  Not a claim, but an issue I would have as to

4    the diversity case.

5    MR. WILKINSON:  I do understand that.  And I think

6    there are very important privacy rights in, you know, any

7    litigation around prescription drugs or even around health care

8    services received.  And I think that there have to be, you

9    know, very strenuous safeguards that the folks receiving the

10   claims today that are going to be made by individuals.  You

11   know, the Court has got to be assured that none of that

12   information will ever get out to anywhere so that, you know,

13   any Congress person or senator or judge or, you know, someone

14   who aspired to one of those positions could file a claim with

15   the claims administrators and know that that information is not

16   going to get out. I think that is very important to make sure

17   we do this proactively because people are volunteering

18   information about drugs they have taken and this is an area

19   where class members face a certain stigma.

20   THE COURT:  But if the list is provided to plaintiffs

21   and defense counsel.  Obviously that list of consumers doesn't

22   go to Court.  I can't do anything.  And they are going to have

23   third parties.  Of course I can issue some kind of gag order,

24   but I am going on one side the benefit of getting a possible

25   class of people and names out there vs. the rights of privacy

1    of those who don't even want to be put into that class, even

2    though they are potential class members.  That is my concern.

3    I have to weigh that.

4            MR. WILKINSON:  No.  I do understand that.

5            THE COURT:  Again, that is a right to privacy that

6    probably goes beyond any right to notification.  That is the

7    concern I have.

8            MR. WILKINSON:  Sure.  I understand that.  And the

9    Court has got to weigh, you know, has got to extrapolate and

10   weigh what we think these consumers' interest in terms of their

11   privacy are with their interest in due process and finding out

12   about this claim opportunity.

13           You know, I feel confident that if counsel for the

14   plaintiffs and the defendant were, you know, allowed to see

15   this information, you know, their professional responsibility,

16   you know, code and their practices in that area would safeguard

17   that information quite assuredly.  They are certainly privy to

18   a lot of information that, you know, is potentially, you know,

19   damaging and very valuable commercially, et cetera.  The only

20   third party I would propose that would see this information

21   would be the claims administrators who are receiving this

22   information from claims coming in as well.  So I really propose

23   we expand this to other groups.  I would be happy to work with

24   class counsel and, you know, the Court on finding out more

25   information about how this is currently being done to be as

1 HIPAA compliant as it needs to be to, you know, have assured

2 several judges that this is a, fair process that does not

3 violate people's HIPAA rights.

4      I can't speak to the possible preemption issues rising

5 around the constitutional protections here in the associated

6 independent state of Puerto Rico.  You know, that, I haven't

7 looked at all.  So aside from --

8      THE COURT:  I don't think that there would be that.

9 HIPAA has that protection, but there is also a right of

10 privacy.  I think both HIPAA and the constitutional right to

11 privacy goes hand in hand.

12      MR. WILKINSON:  Certainly.  I do agree.  I do agree,

13 but I feel that even that that is not an avenue that could be

14 explored then perhaps there are other avenues that could be

15 explored and are being explored right now.  In the *Average*

16 *Wholesale Price* litigation going on the plaintiffs -- I'm

17 sorry -- the TPP segment of the class were asked when they

18 filed claims for their segment of the fund, they were asked to

19 provide documentation on their consumer's coverage for

20 something like 386 different drugs that were involved in

21 litigation.  So they are going to help identify class members

22 using information, you know, that they have.  And, again, this

23 was done in a HIPAA-compliant manner as well.

24      You know, that effort was not explored or, you know,

25 requested from the Court in this particular case, and we find

1    that to be unfortunate.

2         THE COURT:  Let me ask, the other cases that you have

3    involving the litigation that you mentioned, do they involve

4    personal damages or are they similar to this case?

5         MR. WILKINSON:  No.  So those two cases actually dealt

6    with gaming of the drug reimbursement system or the drug

7    processing system.  In one case it was the manipulation of the

8    drug pricing used by insurers and also sometimes used with

9    cash-purchasing consumers to purchase drugs at pharmacies.

10   That is the First Databank McKesson band litigation.

11        The second was the *Wholesale Price Litigation* and that

12   was the same set of facts where the prices of certain drugs

13   that were reimbursed under Medicare Part (B) for doctor-

14   administered drugs, those prices were manipulated in order to

15   promote one drug over another.

16        THE COURT:  Unless there is a gag order, do you know

17   what the -- actually there isn't, it is a class action

18   settlement, but what were the class action settlements in that

19   case?

20        MR. WILKINSON:  The settlement amount in the First

21   Databank case which deals with 386 drugs is 350 million

22   dollars.

23        THE COURT:  And per person?  Per claimant?

24        MR. WILKINSON:  Well, I think per claimant it is going

25   to depend on the number and the frequency of the times they

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

1    took those 386 drugs.

2          THE COURT:  Okay.  So that is a more complicated case.

3          MR. WILKINSON:  It is more complicated.  It is more

4    burdensome to subpoena that information from pharmacies because

5    you are dealing with a lot of drugs, et cetera.  Here it would

6    be somewhat easier.  And the *Wholesale Price Litigation*, you

7    know, there are several settlements in that case, but one of

8    them deals with 11 drug company defendants.  And it is for 125

9    million dollars.  And the third-party payors in both cases, I

10   believe, they received 80 or 82 percent of those amounts and

11   the consumers get the smaller balances.

12         And we would love to work with the Court and class

13   counsel to try to devise some way to improve the notice that

14   gets out to the consumer class members because we are highly

15   concerned, given the structure of this settlement, that there

16   could be very few consumers filing claims.  And, you know, that

17   could lead to, you know, negative policies as described by, you

18   know, objector Weinstein's attorney just a few moments ago,

19   which we completely agree with.  There are a couple of aspects

20   that we find --

21         THE COURT:  Isn't this the sort of case that, no

22   matter, let's assume even more money was put in the pot, isn't

23   this the sort of case because the -- no damages, perhaps

24   getting a new pill, if you are getting 50 dollars or 150, you

25   are getting your money's worth and there is no personal damages

1    here, at least in this action; no matter what happens, we are

2    still not going to get too many consumers asking for money

3    back.

4              MR. WILKINSON:  Yeah.  We hope not.  I mean, it is

5    unclear exactly how many consumers were affected by this

6    because there are disputed facts around how many of these pills

7    were in the stream of Paxil's CR.  Right?  That is disputed,

8    but it seems there could be as many as 14 million consumers

9    that took one of these pills that were split or defective, etc.

10             One of the aspects of the notice that we found in

11   talking to objector Fox, when we described the notice to her,

12   she, first of all, said that she could not recall if she had

13   taken a pill that was split.  And she said when she was taking

14   Paxil she was very depressed.  There were times when she could

15   barely make herself take the medicine.  And it does go back to

16   between four to seven years ago that she would have to remember

17   this.  She said there were times when she was just so depressed

18   she just could not remember that at all.

19             I think one problem is that the case has been talked

20   about in terms of being related to these split pills.  It seems

21   like if a pill splits it would be in two halves, etc.  But the

22   release, the release in the settlement is much broader than

23   that.  It says the parties are releasing all claims related to

24   defective or adulterated Paxil CR manufactured at the Cidra

25   facility.  Therefore, I think it would be more accurate to

 1    solicit claims from Paxil CR consumers who either took a pill

 2    that was split or that they felt was defective.  And, in

 3    Ms. Fox's case, she felt she took Paxil CR, and it did not help

 4    her depression at all.  There could be biological reasons for

 5    that.  Certainly.  These drugs don't work the same for every

 6    person.  Requiring that the pill be split for a consumer to

 7    know they can file a claim but releasing a different type of

 8    claim makes the notice not as broad as the release that they

 9    are giving up.  We are worrying about this pool of class action

10    members, what they would be giving up.

11         There is another deficiency which, Your Honor, I am

12    glad you talked about earlier, about the dates that notices

13    around the right to object were posted, et cetera.  And there

14    is one significant problem with the notice.  It is stated that

15    for your objection to be considered you have to appear in court

16    today.  And, you know, that is not, we feel, a valid rule of

17    law.  Newberg on class actions has stated that that is not a

18    viable principle.

19         THE COURT:  Okay.  But I stated there were other

20    objectors who were not here.  They submitted objections in

21    writing.  I mentioned -- not in writing, I mentioned here at

22    the beginning of the hearing I am going to consider everybody

23    that is objecting.  There is a date for objecting and then

24    there is a date for appearing.  If I cure that by saying

25    anything that has been filed, duly filed in writing or

1   notified, I am going to consider.  I think -- and also I would

2   say that almost everything that has been filed over what you

3   are stating or objector Weinstein stated or anybody else and,

4   for all purposes, for anybody who even has an objector or would

5   have liked to object, I can say you have some very good

6   objections and with Mr. Weinstein and everybody else, I will

7   consider those objections, if your objections convince me

8   everybody is going to benefit.  And you represent a group, an

9   interest group, which, in a sense, is like a class action

10  within the class action here.  It is on the count of the class

11  action for all purposes.  The same with Mr. Weinstein.  I hope

12  I got his last name right, Weinstein.

13          MR. WEINSTEIN:  Yes, sir.

14          THE COURT:  So, for all purpose, there have been

15  objections.  And for all purposes, I am applying these

16  objections to everyone else.  And I don't think that your

17  problem -- Mr. Weinstein has some more practical policy

18  objections.  You have some due process notice objections, but I

19  will say, for the purposes of the record, I will consider your

20  objections.  If you prevail, every other possible claimant will

21  prevail the same as with Mr. Weinstein's arguments or the

22  arguments of other counsel.

23          MR. WILKINSON:  Sure.

24          THE COURT:  I will consider for everybody everything

25  that has been submitted in writing.  So I don't think the fact

1    that somebody couldn't make it here.  Of, course, for 50

2    dollars I am not going to expect them to pay seven hundred

3    dollars to travel here.  The hotels here are more expensive

4    than probably London or Paris.

5          MR. WILKINSON:  I would agree.  That would be a

6    concern.  But I also think that there is a possible chilling

7    effect that were someone to read this notice and understand

8    that in order to have an objection heard they have to plan to

9    appear.  That really is certainly perhaps moot with the

10   consumers because they are not going to plan to come down here

11   for 50 or for a 150-dollar claim to hear the case.  But perhaps

12   a small third-party payor who had significant spending on Paxil

13   CR during the class period.  They may feel this is a little bit

14   unfair to us because on the TPP claim side the damages are

15   being, you know, approximated based not on their actual

16   spending for Paxil CR tablets that are split or even Paxil CR

17   tablets at all, but just their presence in the marketplace

18   being a TPP as of the date they filed the claim.  Right?

19         THE COURT:  But as of today no third-party payor has

20   objected.  You have that concern.  But if they were but -- I am

21   sure the larger ones are probably going to benefit more.  They

22   would probably have objected as well.  Nobody has objected.

23         MR. WILKINSON:  You are right.  The larger ones are not

24   going to object to this formula.  And I think statistically

25   once you are large enough TPP you are not going to have a

1    spending that does not reflect on average your size in the

2    market.  But a smaller TPP who has 1,000 covered lives or

3    something like that.  And there 40,000 TPPs that got direct

4    mail notice of this, the settlement.

5         A small TPP with 1,000 covered lives is going to be

6    eligible for, I believe, a 47-dollar claim.  And they could

7    have one prescription that they filled for Paxil and that they

8    covered the cost of; and that's going to eat up, you know, any

9    benefit they would have.

10        So they might have an argument that the damages should

11   be calculated either based on the approximation or on data that

12   we submit showing what our actual Paxil CR purchases during the

13   class period were.  Because when they are small, the disparity

14   between those two could be much greater.

15        And because, you know, small TPPs might have read this

16   notice and understood that my objections aren't going to be

17   heard unless I go there.  I am not going to bother to do it.

18   That is a problem.  This same provision was actually in the --

19        THE COURT:  But at the same time this might be devil's

20   advocate, but you might have a small TPP, but you could have

21   several small TPP's that could retain somebody in a group like

22   yours to represent all of them.  They are not here.  But you

23   are here.

24        MR. WILKINSON:  I know I am here.  But they may have

25   read.  They rely on class counsel to apprise them of their

1    rights and their obligations in the notice.  And class counsel

2    failed, clearly failed to do that by including a provision

3    which they now recant they are now going to ask you to consider

4    all objections whether people are here or not.  I agree with

5    that ultimate conclusion, but I think there is a chilling

6    effect that I think is very bad policy.  And this very same

7    provision appeared in the 2008 pediatric Paxil with third-party

8    payors.  And we objected to it then and the Court struck it.

9         I think it is bad policy, and it was the dereliction of

10   class counsel's duty to include that in this particular case.

11   They should know better.  I hate to criticize attorneys because

12   my organization is based upon the premise that we want to get

13   these class actions filed by private attorneys to benefit

14   consumers and small third-party payors.  So I hate to stand

15   here and have to do this.  But the facts of this case are that

16   glaring that I have to make that point.

17        And I think there is a difference -- you could possibly

18   argue that we can't just send claims out to Paxil CR consumers,

19   individual consumers, because we want to show that they

20   actually can prove that they were harmed, that they paid for a

21   pill that was broken or split.  But we aren't requiring that of

22   the TPPs.  We are not requiring they showed they spent any

23   money on Paxil CR.  And their ability to keep records and to

24   show they actually had spending during this class period, four

25   to seven years ago, is much higher than the average consumer's.

1    Our consumer, that we found, couldn't obtain her records going

2    back more than three years from two of the nationwide major

3    pharmacies, CVS and RiteAid.

4         So the burden on her to find documentation for this,

5    you know, I think it is unfair because it is not the same

6    burden that is placed on the more busy savvy and sophisticated

7    third-party payors of the class.

8         So, moving on from, you know, the notice itself, I

9    think the inadequacy of the notice, i.e. the failure of

10   innovative and more directed methods to let consumers know that

11   this opportunity exists is, you know, goes to our complaint

12   about the reversion to GSK.  There is an incentive in this

13   litigation that the fewer claims by the consumers the more

14   money reverts to GSK.  We find that that is very problematic.

15        The best way to solve this without scuttling the entire

16   settlement, and we don't want to see that happen, is to require

17   some kind of additional supplemental efforts to provide notice

18   to the consumers.  So one possible option would be to allow the

19   claims window to be expanded.  There is one case that involved

20   GSK.  I forget which one it was, but in that case there is a

21   reversionary amount of funds that were left for one year for

22   any parties who wished to file claims.

23        And I think that would not be unreasonable in this case

24   because the defendant is gaining a release which, we think, is

25   perhaps overbroad.  They are gaining a release of all those

1    claims.  So why not allow a much broader window to allow these

2    claims to come in?  I think that would be beneficial.

3           On the last point of the attorneys' fees, again, we

4    hate to criticize attorneys' fees because we know this is a

5    vital public role these class actions play, and we support

6    them; and, you know, we actively get groups involved in these

7    cases.  But in this particular case there is a potential that

8    the benefit to the class, to the consumer segment, is very

9    illusory as counsel Weinstein said a moment ago; and we

10   completely support all his concerns in that regard.

11          I also would just like to point out that I don't think

12   that this case is going to be decided based on case law and

13   precedent.  You have an awful lot of jurisdiction discretion,

14   Your Honor, to make this decision about attorneys' fees.  But

15   some of the cases that have been cited like *Waters vs.*

16   *International Metal*, that was a very different case and could

17   be distinguished in that the common fund in that case was

18   actually -- the size of the fund was related to how much each

19   class member obtained.  The class members' claims were

20   proportional to a percentage of the common fund.  So, in that

21   case, the bigger the fund the more claimants got.  If they

22   didn't participate in the claims process, you know, at least

23   the rest of the claims made by class members who did, received

24   a benefit.

25          And then in the *Master's vs. Wilhelmina* case and I

1    believe it was also called *Williams vs. MGM*.  In that case

2    there was no reversion to the defendant.  The money was

3    actually -- the decision for the Court was to use the money for

4    increased claims to the existing, increasing the amount of

5    money given to the existing claimants or a cy pres award.  So,

6    you know, in this case there was a reversion.  And I think that

7    really undermines the potential justification for attorneys'

8    fees.

9         And I would, you know, strenuously support counsel

10   Weinstein's suggestion that you continue this fairness hearing

11   to some date after August 10th.  Not only so that we could

12   evaluate and perhaps brief the issue of whether the attorneys'

13   fees should be awarded based on looking at the actual claims

14   that were filed, but we should also look at whether there

15   should be supplemental notice efforts to try to increase the

16   number of claims filed, because that is the only way to prevent

17   all these claims from being released.  Right?  Which it's going

18   to happen on August 10th.  So the only way to prevent, you

19   know, that injustice to the consumer class is to try to explore

20   supplemental notice efforts.

21        THE COURT:  Let me ask a question, what if the Court

22   disagrees with the attorneys fees, rather than 8.5 says 4.0 or

23   5.0.  Would that change your argument?  It seemed to me, you

24   know, not only from you, but from other counsel, from

25   Mr. Weinstein objecting to the attorneys' fees; fees that the

1    main objection is that, it seems to me that, let's assume that

2    very few persons make these claims, it's a windfall for these

3    attorneys who are making somewhat of a fortune, whereas the

4    actual claimants did not claim that much.

5          The other group of plaintiffs does get the money.

6    But....

7          MR. WILKINSON:  You know, on that point the request of

8    28 percent of the 11.2 million dollars that are allocated for

9    the third-party payors, I think that that fee request is very

10   reasonable.  Class counsel has constructed a very creative way

11   to provide all of the money in the fund going out to parties

12   who are affected or potentially affected, and I applaud that.

13   I think that is actually a good thing.  I would like to see

14   that same kind of mathematics and reasoning applied to the

15   consumers.

16         If it is not, the third-party payor allocation of

17   attorney's funds, I believe that is 3.1 million dollars.  On

18   the consumers' side, that is 16.8 million dollars, I would like

19   to see the amount of attorneys' fees that are awarded to class

20   counsel linked to how well they did not only in creating the

21   fund that exists, but also creating a notice program that lets

22   consumers know.  You know, so this would mean that, you know,

23   they would be advocates for supplemental notice come a

24   continued hearing in mid August or so if their fees were linked

25   to that.  I think that would be very beneficial to the class

1   and it would eliminate the potential appearance of conflict of

2   interest in this case.

3        I would hate to see something like one million dollars

4   go out to 20,000 claims that are filed.  Your Honor, our

5   experience with these cases is that three, four, maybe five

6   percent of consumers who are eligible ever file a claim.

7   Right?  So the numbers could be that low easily.  And so if one

8   million dollars goes out.

9        THE COURT:  Also let's assume they were to send

10  supplemental notices in the mail and we go around the HIPAA

11  issue, and I'm talking from personal experience, but I assume I

12  speak for most of us.  When you get notices like this in the

13  mail that says you may be eligible for 100 dollars or 150

14  dollars most of us just throw them out.  Do you have any

15  statistics overall on these types of claims and what the actual

16  number of claimants is?  Even if we give the notice as you

17  would like it to be provided, does it go higher or does it stay

18  there?

19       I have received things.  And it hasn't been HIPAA

20  related, but I don't -- small amounts of shares for X, Y, and Z

21  companies and I never, it is like when I get the proxies.  It

22  is like vote for the board of directors.  And 99 percent of the

23  time I throw them out except one company that I like.  That is

24  my other concern.  And the other thing I do have a concern,

25  let's assume Mr. Nevares had litigated this case only as to

1   Ms. Simonet and prevailed.

2          Again, had he prevailed under the Puerto Rico law

3   perhaps she would have gotten a very small amount and perhaps

4   under Puerto Rico law he might not be entitled automatically to

5   attorneys' fees.  But it would have opened up and gone through

6   the whole exercise of opening up a very dangerous precedent for

7   GlaxoSmithKline.  It is public and then he is going to have

8   expert testimony.

9          And it is going to be public and then comes a second

10  lawsuit and a third lawsuit, and that is what GSK wants to

11  avoid.  If they were to litigate, even if it weren't a class

12  action, if they were litigating separately different claims

13  by -- let's assume it is not a class action.  But cases,

14  sometimes here in this Court we have them and we have 200

15  claimants and they all get consolidated.  For all purposes, I

16  have 200 plaintiffs here, but they are all litigated.  That

17  would run up, you know, it could be 10 or 15 different

18  attorneys litigating.  Those attorneys' fees could go higher

19  than eight million if they have to litigate that here.  They

20  get filed at different times.  I may end up with some cases.

21  If I don't consolidate the cases and some get filed later it

22  could go to a different judge.  It is different statute of

23  limitations required as to each plaintiff.  When did each

24  plaintiff receive notice or find out that he had a possible

25  claim.  So, you know, we could have minors who don't -- who

1    here in Puerto Rico, if you are a minor and let's assume

2    someone who was taking Paxil was 12 years old.  That case could

3    get filed, nine years from now.  And, in a sense, by doing the

4    class action they are avoiding all those suits which, you know,

5    Mr. Nevares could bring.  And he has had, for example,

6    political discrimination cases.  He has brought 10 separate

7    cases.  And let's assume that he prevailed in eight of those

8    cases.  He got attorneys' fees and all.  And maybe that's from

9    GSK's perspective they are trying to avoid that multiplicity

10   and litigation.

11          I don't know if you have anything to add.

12          MR. WILKINSON:  Sure.  So there class counsel's fees

13   through this settlement might end up being less than what they

14   might be awarded if they were to bring these claims

15   individually under a consumer protection statute, if there is

16   one here in Puerto Rico.

17          THE COURT:  Also for GSK, by settling this, even though

18   they may be paying individual counsels a bit more than if this

19   were just one or two plaintiffs, but they are avoiding having

20   to do that multiple time.  So for them it is a windfall because

21   they are paying a lot of money, but by avoiding what they could

22   be paying.  In the United States there could be other cases.

23          MR. WILKINSON:  Sure.  I agree that the awards for

24   attorneys could be greater if they try these cases

25   individually.  And if they were --

1           THE COURT:   GSK attorneys are also saving their client

2     a lot of money.   If they litigated 300 cases nationwide they

3     will make a lot of money, but their client is going to lose a

4     lot of money.   And the way I look at it, and I acknowledge

5     everything that you stated to the Court, as has prior counsel,

6     but isn't this, I am keeping in mind, the consumers are there,

7     I am not forgetting about the consumers, but isn't this sort

8     of -- this is the sort of case where any individual consumer,

9     at least based on my ruling here in Puerto Rico law, is not

10    going to make money.   Nobody is going to bring these cases.

11    And you know, it will probably end up -- they are not going to

12    end up in small claims court.   You have to prove so much.   Just

13    proving one single case is going to cost too much money.   The

14    only incentive for plaintiffs to bring this is to bring this

15    through a class action.

16          And, again, for the defense, on the other side, from a

17    business perspective they are going to settle in a class action

18    because otherwise they are just going to have too much -- they

19    could have several individual claims.   And that is the problem

20    in this case because if we were talking about personal injury

21    or more significant claims, then a lot of, you know, and

22    settlement from the consumer's perspective or from the victim's

23    perspective that, perhaps, weighs more.   But this is the sort

24    of litigation that, perhaps, you know, the consumers and

25    everybody else have probably equal weights.   And that's my

1   concern.  If it wasn't for plaintiffs' counsel here, this

2   lawsuit, you know, it is very hard to find people to bring it.

3         MR. WILKINSON:  Sure.  I agree.

4         THE COURT:  Not only here, but any other state for any

5   other class action.

6         MR. WILKINSON:  There are cases that we know that we

7   have been approached by attorneys who identified some, you

8   know, unfair deceptive practice within the prescription drug

9   industry and process and they identified the practice to us.

10  So they made sure that these cases were brought.  The class

11  counsel play a vital role in this.  We support the class action

12  litigation cases to bring these cases that would not be brought

13  otherwise.

14        But the caveat is the class counsel, once they are put

15  in this case are put in the difficult position, as counsel

16  Weinstein described earlier, that they have the potential to

17  receive attorneys' fees that are significant.  And the

18  defendant wants to get peace from the case, the general release

19  that will make it go away nationwide.  But it is the consumers

20  that we are most concerned about.  And the judge in these cases

21  has to play a heightened role scrutinizing what the terms of

22  the settlement are because the judge acts as a fiduciary on

23  behalf of all the absent class members.

24        It is different than, you know, the normal litigation

25  where the two parties are before the Court.

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

1    THE COURT:  What if I play the more active role and I

2    say, no, no, I am not going to approve this.  And eight million

3    go to cy pres.  And I wait until August 10 and there is eight

4    million they will have to hand out.  The cy pres money also is

5    never going to go to consumers anyway.

6        MR. WILKINSON:  Right.  So I would support cy pres as

7    an alternative way to try to benefit consumers who are harmed

8    by whatever practice was alleged.  And an alternative benefit

9    received in exchange for their release.  Right?  So cy pres

10   award, in many cases, can be appropriate especially in many

11   cases like this where it may be hard to identify which

12   consumers took a split pill, especially in cases where the

13   nature of the class members themselves makes it harder for them

14   to self-identify and say, "Yes, I did take a split pill."

15       I mean, split pills are not uncommon.  People split

16   their own pills regularly.  So if you open a bottle of Paxil CR

17   and find that pills are broken or split you are not going to

18   know that these pills are not going to work.  Class members are

19   not going to know at that moment that they have been harmed.

20   They have paid for something that was defective.  In this

21   particular case a cy pres award might be the most warranted

22   because it is hard for the class members to come forward.

23       THE COURT:  Okay.  But that cy pres award, those class

24   members would never see a cent of that cy pres award.

25       MR. WILKINSON:  They wouldn't.  But there would be

1    benefits to -- there can be benefits through public education

2    and advocacy, teaching consumers about, you know, the risks of

3    taking pills that are defective.  What to look for when you

4    open your prescriptions if the pills are broken, how to read

5    and understand labels to know that a controlled release drug

6    means that the integrity of the pill itself is relevant.

7            THE COURT:  Isn't that something, for example, at least

8    GSK, I am sure, and again, I am not putting words in their

9    mouth, but, I am sure that from this experience they are going

10   to take a big look at labeling to avoid future cases like that.

11   Isn't that something that, you know, because, obviously, if

12   they don't do this, and let's assume that for Paxil, for any

13   other drug, I am sure for all those labels, and when they

14   advertise drugs to doctors, they can perhaps insure they are

15   going to have a bit more of an aggressive campaign.  Don't take

16   the split pill.  Bring it back or take it to the doctor.  You

17   know, they can do that outside of the settlement.  And I am

18   sure they are probably going to do it because they don't want,

19   obviously, this case is going to get settled hopefully.

20           The public is going to know about it and then every

21   time there is another split drug they are going to sue them

22   again and bring a class action.

23           So can't the industry itself take those precautionary

24   measures?

25           MR. WILKINSON:  Well, you know, with all due respect to

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

98

1    my brothers here on behalf of GSK, I don't think the industry

2    takes those proactive steps even after litigation has happened.

3    And I think in this particular case, this case is flying over

4    the radar.  Most consumers don't know about this case.  We

5    talked to something like 20 people who are consumers who signed

6    up through our web site or other means and who had taken Paxil

7    and none of them had heard about this settlement at all.  And

8    none of them had taken Paxil CR.  Half of them knew they hadn't

9    taken Paxil CR.  The other half of them were not sure whether

10   it was Paxil or Paxil CR that they took.

11          So consumers have not been educated about what to look

12   for just by the presence of the litigation here.  And they

13   certainly haven't been educated about the opportunity to file a

14   claim.  So we feel that those things would warrant a cy pres

15   award as an alternative.  Unfortunately, the Court is faced

16   with a decision with this settlement of --

17          THE COURT:  What about the persons who have filed

18   claims by now, who have been diligent and perhaps represent

19   that 80 percent of the people who read.  You know, and I don't

20   think there is no way of knowing perhaps the persons you

21   communicated to, that particular group doesn't read.  Again, I

22   don't know.

23          And, again, for example, I haven't seen any.  Of

24   course, I approved this.  I know about it, but I haven't read

25   anything or perhaps seen anything in the paper where, you know,

1    maybe I read or maybe I have seen something about Paxil.  But I

2    am not taking Paxil because I do see those ads, not for this

3    case, but I do see them on TV or radio or cable or local TV.

4    You open up the newspaper and there is a big article.  I know I

5    am not taking that.  And I have seen them for different

6    multiple drugs.  I think it is not Viagra.  It is the other

7    company.  There have been some recalls recently.  You see the

8    publicity when you look at the magazines or the ads on TV,

9    please call blah, blah, blah.

10         MR. WILKINSON:  I agree.  Just that, you know, just

11   seeing one of these ads sometimes is not enough to spur a

12   consumer to act.  I think as the affidavit submitted by

13   Ms. Cancelo, the agent hired to do the notice program, I think

14   her statistics estimate that something like 80 percent of the

15   class members have seen -- are calculated to have seen one of

16   these ads twice.

17         THE COURT:  In this case.

18         MR. WILKINSON:  In this case, right.

19         THE COURT:  In this case this is consonant with

20   counsel's estimate.

21         MR. WILKINSON:  I think it was based on her affidavit.

22   I think their estimate was based on that affidavit.  You know,

23   just seeing one of these ads two times does not necessarily let

24   you know, you know, this is about you.  This is something you

25   can participate in.  People see.  Information overload happens

1    when people sees these things all the time.

2         THE COURT:  You don't have somebody who submitted like

3    an affidavit or an expert to tell the Court that.  You only see

4    it twice or three times.

5         MR. WILKINSON:  I don't have that expert.  I don't have

6    that evidence.  The only evidence is the one consumer we spoke

7    to who has not heard the evidence at all.  She is an educated

8    person, a Ph.D., a sociology professor, very interested, and

9    concerned, but had not known about the settlement at all.  That

10   is the problem with these traditional al forms of a publication

11   notice.  It doesn't reach people.

12        THE COURT:  Let's assume that everything she says is

13   100 percent truthful, but I would be weighing her

14   representations versus at least, you know, eight to ten

15   thousand persons who already filed claims:  And I assume, you

16   know, we have persons in New York, Florida, Texas, Montana,

17   Idaho, Guam, you know Oregon, at least we have one in Puerto

18   Rico.

19        MR. WILKINSON:  On August 11 we are going to be faced

20   with a decision of what to do about -- let's say, 10,000 claims

21   are filed.  That is going to turn into a half a million dollars

22   worth of claims sent out if they are all in the 50-dollar

23   range.  Then the Court has got to, you know, got to decide what

24   is fair to the absent members of the class.  Is it better to do

25   some kind of supplemental notice in exchange for the claims

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

1    that are going to be released.  Is it fairer to extend the

2    claims deadline period to a large enough window to let people

3    find out about the settlement and participate?  Or should the

4    settlement just be rejected?  There are not enough consumers

5    releasing their claims participating to make this release worth

6    while.  That puts the consumers back in the boat, the failure

7    of the litigation by class counsel.  It is not like they got

8    nothing.  Their fate is to litigate the class action forward.

9    Right?  I don't support -- this one case is --

10            THE COURT:  This case has already been certified as a

11   class.  Am I correct?

12            MR. WILKINSON:  Your Honor, I was not aware that was

13   true actually.  But my involvement in this case started, you

14   know, three days before the objection deadline when we first

15   found out about the case.

16            THE COURT:  The problem is even though there being a

17   class nobody opted out of the class.

18            MR. WILKINSON:  Okay.  I thought this was a settlement

19   class where it was certified for purposes of settlement and the

20   first notice about the case went out with the claims.

21            THE COURT:  You are correct and, Counsel, not that the

22   class was certified and then there was a settlement.  You are

23   correct.

24            MR. WILKINSON:  Okay.  All right.  You know, consumers,

25   why are they going to opt out?  My concern -- my concern is not

 1    the consumers --

 2         THE COURT:  Then I approved the class and Mr. Nevares

 3    litigates the case.  I am also sure if there are going to be

 4    objectors to the class we would have, perhaps, you and counsel

 5    Weinstein and the two other counsel and that's -- again, I have

 6    had class actions.  I have had at least one big class action

 7    that was settled for 77 million dollars; and that involved 1st

 8    Bank.  It involved shares of stock that were advertised or sold

 9    and allegedly weren't worth what they were sold for.

10         Once the 12(B)(6) was denied, as is in this case, the

11    case got settled.  In that case I think there was only one

12    objector.  Again, that was a case where every individual

13    person -- and that is a case where you have names and it is

14    easier for everybody to get the money.  In that case there was

15    only one objector.  Nobody showed up.  And I have another class

16    action I am working on.  And that's my -- at least, from my

17    experience, not too many people object to these things.

18         Going back, I don't think Mr. Nevares was involved in

19    that case, it was a Rico antitrust case here involving Volvo 15

20    years ago.  I think the final settlement, Mr. Barrios was

21    involved in that case.  I think that case -- it is no secret --

22    what everybody got at the end was a fifty-dollar certificate

23    or.

24         MR. BARRIOS:  It was overturned on appeal, Your Honor.

25    They got nothing.

YVETTE RICHARDSON, CSR, RPR, CCR

1        THE COURT:  At least some people got the certificate

2   early on.  I remember the settlement that was approved at some

3   point was like 50 dollars.  And I think that case got

4   litigated.  It was a class action.  What happened was there was

5   no settlement.  But it was a class action, but it was like 50

6   dollars what everybody got.  Some people did get the

7   certificate and probably used it before the appeal.  But it was

8   like 50 dollars.  Am I correct, Mr. Barrios, something like

9   that?

10       MR. BARRETO:  I don't remember Your Honor.

11       THE COURT:  That was a case that was not very high that

12  actually got litigated.

13       MR. WILKINSON:  I have seen cases where, cases like

14  that where you can actually mail notice to every class member

15  and they have the opportunity to choose to opt out or not.  And

16  my concern here is that the notice was not disseminated broadly

17  enough so a lot of people don't know and they didn't choose to

18  opt out.  The decision to opt out were erroneous so they

19  thought they had to come down here to the beautiful associated

20  independent state of Puerto Rico to opt out -- to object -- not

21  to opt out, but to object.  So I think the reaction of the

22  class is not a good indicator of the support of the settlement.

23  But, personally, but I am really most concerned about the

24  absent class members who haven't heard about it at all who are

25  being asked to release claims.

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

104

1    And I think, rather than scuttle the settlement and

2    provide nothing to consumers and third-party payors I would

3    like to see the Court require supplemental notice that explores

4    different ways that are HIPAA compliant to identify consumers

5    who might be able to participate.

6    THE COURT:  Okay.  Let me ask one final question.

7    Wouldn't you judge this case, if you were in my position,

8    differently from a case of Paxil which caused personal injury

9    versus a case there is no personal injury.  Personal injury is

10    not a claim.  Isn't it different?  Because I think in the

11    personal injury case, if this were the scenario, I would give

12    much more notice because I would be settling this case for

13    persons who conceivably would be injured.

14    And it is very hard.  And perhaps the class would be

15    different because, but, again, this is just a specific class of

16    persons who have taken the split Paxil and they didn't get

17    their monies worth for that pill.  Because I believe that -- I

18    lost the opinion, but I believe there were some other claims

19    here that got dismissed that GSK prevailed.  But what is left

20    is the broken -- this is not a case, even though it is

21    important for consumers, I don't think this is a case that,

22    again, these are not pills.  There is no allegation here in the

23    settlement that this caused cancer or somebody became impotent

24    or had birth defects.  That would be, in my opinion, a very

25    different scenario.  And, probably, you know, under these terms

YVETTE RICHARDSON, CSR, RPR, CCR

1    I wouldn't be settling that.  The notice would have to be much

2    different.  This is a different case.  It probably only

3    involves 50 dollars.  It could be more, 150.  Most people

4    aren't going to go through the trouble to fill out the

5    paperwork.  Most people see under, "Penalty of perjury," I have

6    to sign this.  You know, and again, 10,000 -- if we get 15,000

7    or 20, that is a big number.

8         MR. WILKINSON:  The reticence of consumers to know they

9    were harmed, right, or even if they know they were harmed

10   financially by buying a product that didn't work, right, they

11   are going to be able to understand that or their reticence to,

12   even if they do see a notice to the class, by filing a claim,

13   both of those are proactive to send the consumers who we can

14   best identify, a claim, because they are giving up, they are

15   releasing these claims.  So they should get something in

16   return.

17        THE COURT:  Let me say something else, because if this

18   case is settled through the class action and over your

19   objections and Mr. Weinstein's objections, this settlement does

20   not preclude anybody who would conceivably have any personal --

21   let's assume somebody through this because of a split pill had

22   some personal injury here in this jurisdiction or any other

23   jurisdiction from bringing that claim because that has not been

24   settled here.  What has been settled here are the claims that

25   survived and the plaintiffs that was here.

1   But if a new plaintiff comes in and there is no statute

2   of limitations they can raise, you know, that's not precluded

3   by the settlement.

4   MR. WILKINSON:  Right.  So this settlement is only

5   about economic damages.  I agree.

6   THE COURT:  I issued a -- you know, I have an opinion

7   denying the motion to dismiss.  But because it's been settled,

8   for all purposes it's, you know, obviously that might apply to

9   the plaintiffs in this case.  But it doesn't apply to, and I

10  think counsel, you agree with me, this doesn't apply to other

11  claims and other plaintiffs.

12  MR. WILKINSON:  That's correct.  I think other claims

13  face a statute of limitations problem.  But, Your Honor, again

14  that is not a matter before the Court.

15  THE COURT:  Let me say this, this is not one of these

16  cases where it is an MDL case where we would conceivably have

17  because we have some other MDL cases.  If this were a multi

18  district litigation case perhaps we would have a Paxil claim in

19  California, one in Minnesota, New York, southern district,

20  eastern northern district, Florida district and Texas, we

21  probably wouldn't be here.  We have the California claim and we

22  have the Puerto Rico.  So it is probably not too many attorneys

23  even interested in bringing in these claims as a class action.

24  MR. WILKINSON:  Right.  I understand that that is how

25  this case started, but the release is nationwide.  It affects

1    the consumer we found in Portland, Oregon.  It affects any

2    other consumers that we don't find and the claims process does

3    not find.  And I am most concerned about the absent class

4    members receiving adequate notice and that is -- so they can

5    participate in the settlement.

6          My subsidiary concern is that the structure of the

7    settlement, you know, is out there on record such that the

8    attorneys' fees are not linked to what we feel is their, you

9    know, aligning their interests with that of the consumer class.

10   I think that is very troubling to us to see this settlement

11   structured in the way it is.

12         THE COURT:  Okay.  Thank you very much and I appreciate

13   it.

14         You are welcome to stay.  I know you have to catch a

15   plane, if you need to leave.  Thank you very much.  And, again,

16   I will issue my ruling at some point.  Just to let you know,

17   thank you very much.  And even if I don't agree with you in

18   this case, again, I am going to think about it.  But you have

19   illuminated the Court because I do get a lot of class actions,

20   but you may not prevail here, but in the long run you have been

21   very informative.  It may help in other cases, if not

22   indirectly.

23         So thank you very much.  And you are always welcome

24   here to object in any other case.

25         Okay.  Some minor questions of counsel.  Let me just

1    ask both sides, because, again, I haven't approved the final

2    settlement.  Let's assume I feel comfortable with the

3    settlement and this is a hypothetical.  I am not saying I

4    don't.  But let's assume I am saying I don't feel comfortable

5    with the 8.5 million.  I would feel comfortable approving the

6    whole settlement but with attorneys receiving let's say 6.5

7    rather than 8.5.  What would be the parties' contention?  Would

8    you go through with the settlement or is it an all or nothing

9    settlement?

10         MR. STRANGE:  Your Honor, you have the discretion to

11   approve whatever attorneys' fees you think are appropriate.  If

12   you approve the settlement the settlement is approved.

13   Whatever fee you approve we will take it.

14         THE COURT:  So you submit it to me for approval subject

15   to any modifications.

16         MR. STRANGE:  With respect to the attorneys' fees.  Not

17   with respect to the settlement.

18         THE COURT:  It is important because it is important

19   that if I do approve the 8.5 or I reduce it somewhat a bit, but

20   it is important that I will obviously let it be known in the

21   opinion that it is because the Court has decided that that's

22   what is approved and not that it is the parties and the Court

23   is rubber-stamping it.

24         MR. STRANGE:  Yes, your Honor.

25         MR. HEROLD:  Your Honor, if I may address that.  I

1    agree with what Mr. Strange has said, and would direct the

2    Court specifically to paragraph 20 of the settlement agreement,

3    which lays out whether or not either party can terminate the

4    settlement based on what the Court does.  And essentially what

5    it says is that if the Court changes a material provision of

6    the settlement agreement itself then either party would have

7    the right to terminate.  But if the Court awards attorneys'

8    fees in whatever amount, that is not a ground for termination.

9    But GSK has no position.

10        THE COURT:  Mr. Nevares seems he wants to settle for

11   the one dollar.

12        MR. HEROLD:  I am not suggesting that.

13        THE COURT:  I will seriously look into that.  For

14   example, the cy pres issue, that will allow the parties to

15   withdraw from the agreement.

16        MR. HEROLD:  Correct.

17        THE COURT:  I don't have any other questions.  If there

18   is anything briefly that anyone wants to bring up.

19        Let me say this, I am very inclined, for the reasons I

20   have stated, to approve the agreement as it is.  I am going to

21   sit a little bit more on the attorneys' fees.  I think you are

22   all, in what I stated, you are very entitled to attorneys'

23   fees.  And I did my Loadstar analysis.  It does benefit you.

24   And I think this case -- this case, if it had been litigated it

25   would have taken -- it probably would have earned counsel

1   attorneys fees.  So I think the attorneys' fees are necessary

2   for this type of litigation to move on and be settled.  And so,

3   again, if there is any reduction, percentage-wise I don't think

4   it is going to be significant.  There may not be any reduction.

5   Again, I want to sleep on it.  I just want to let you know that

6   I am very inclined to, as I stated earlier, to approve the

7   agreement.

8        This does not involve personal injury.  It only

9   involves the split pills.  And it is a just consumer claim.

10       From my experience with the other litigation, the 1st

11   Bank litigation, nobody objected.

12       So, and okay.

13       Mr. Strange?

14       MR. STRANGE:  Thank you, Your Honor.  I will keep it

15   brief in light of your comments, but I did want to make the

16   point with respect to the PAL objections in that I think

17   counsel misspoke.  They didn't object in Nichols.  Nichols is a

18   reported decision against GSK that I cited to the Court where

19   the Court in approving that settlement held that you don't have

20   to consider the amount claimed.  It is on the total fund.  But,

21   PAL did object to the *Hormon* settlement, which was a settlement

22   I was involved in in Illinois that was a claims-made fund just

23   like this, no reversion just like this; and we have attached

24   for the Court as an exhibit to our response to the objections

25   Exhibit A, a copy of PAL's objections.  And they are identical

1    to the ones they made here.  They made an argument that you

2    have to do it on the amount claimed; and that the Court should

3    delay the approval until you find out how much is claimed.  And

4    there should be a cy pres.

5         In overruling those objections the court in *Hormon* and

6    we recorded it on page 57 of our response to the objections

7    made an important point which is that if the case proceeded to

8    trial and there was a verdict, the defendant would still be

9    entitled to a reversion of the funds depending on how much

10   people claimed.  And citing the *Boeing* case.  That is the main

11   point.  That is why the judge in *Hormon* overruled that

12   objection.  And that is why the Courts continually overrule

13   that objection.

14        And with respect to the issue of whether the fee should

15   be based on the amount of claims or the fund made available,

16   the reason that the defendant or that the objectors talk about

17   a policy reason is because the law is to the contrary.

18        And that's in the *Waters* case that Mr. Nevares already

19   cited to Your Honor.  And that case held "no case is held that

20   a district court must consider only the actual payout

21   determining attorneys' fees."  And that court cited to the

22   *William's* case where the 9th Circuit said a district court

23   abuses discretion by basing the fee on the class members'

24   claims against the fund rather than the percentage of the fund.

25   Because in these types of cases, Your Honor, as Your Honor

1    knows from the Loadstar, they are very difficult to pursue

2    against a very established defendant who hires very capable

3    counsel.  And that's why, with all the work we have done --

4         THE COURT:  And local counsel.

5         MR. HEROLD:  That is what he meant, Your Honor.

6         MR. STRANGE:  That is what I meant.  We have worked on

7    this case for five years.  We have thousands of hours.  Just

8    our Loadstar alone is 4.2 million.  And so to get them to put

9    up this size of a fund --

10        THE COURT:  When you say, "4.2," you mean 4.2 for

11   Puerto Rico or you include California.

12        MR. STRANGE:  All of the California cases.  All the

13   lawyers on the plaintiffs' side.

14        THE COURT:  By settling this, the California case is

15   being settled as well.  This not only takes care of Puerto

16   Rico, but it is taking care of that California case, which is

17   more advanced than Puerto Rico.  In a sense, when I made my

18   calculation of the Loadstar, even if it goes down to three

19   million, you still have to consider the California case, which

20   could add up to what you actually requested in attorneys' fees.

21        MR. STRANGE:  Yes, Your Honor.  Actually, I think the

22   volume of pleadings in that case right now is taller than Your

23   Honor because we've gone through two class certifications

24   motions we filed and all the numerous 11 motions to dismiss

25   just in that case alone.

                    YVETTE RICHARDSON, CSR, RPR, CCR

1        So I do appreciate the time, Your Honor, and we have, I

2    think, put together a settlement that has a substantial benefit

3    to the class and I appreciate it.

4        MR. HEROLD:  Okay.  Your Honor, I have just a few very

5    quick comments.  First, is that we discovered that the order

6    that was submitted to Your Honor, the final approval order was

7    out of date so we prepared a new one.  It reflects all the

8    objections and a few other things.

9        Thank you, Your Honor.

10        And secondly, just to comment very quickly, I notice

11    that my friend from PAL mentioned that the -- what he called

12    the traditional forms of notice are something that PAL doesn't

13    like or wants to add to.  And there is a reason that the

14    traditional forms of notice, which are the forms used in this

15    case are often used.  And you've touched on most of them for

16    this case.  That is, if you require subpoenas to find private

17    information about people taking antidepressants that creates a

18    whole new set of issues.  And he cited to two cases, both of

19    which I am unfamiliar with, the AWP case and another case in

20    Boston.  Both the same judge.  He didn't have any

21    antidepressants involved, at least to my knowledge, Your Honor,

22    in those cases.

23        There is also the expense, Your Honor.  I liken this to

24    the traditional form.  This case is sort of a Cadillac of

25    notice.  It is a good solid traditional notice program.  He is

06CV1230 – ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE – FAIRNESS

1  asking for what I call the Ferrari of notice.  It is very

2  expensive and it is dangerous because it sets a precedent.

3       THE COURT:  And I think that notice, if this involved

4  personal injury or any other type of injury or possible harm to

5  a fetus or something like that, in the '60's litigation, you

6  might need a Ferrari.  You might need a Lotus.  You might need

7  a Lamborghini notice.  But, again, based on my experience and

8  that 1st Bank litigation and class action settlement, it is not

9  that many people actually.

10      MR. HEROLD:  Right.  And we think this notice is well,

11  well within the realm of the types that are traditionally

12  approved.  I just wanted to make that point.

13      THE COURT:  Mr. Nevares.

14      MR. NEVARES:  Mr. Salas.

15      MR. SALAS:  Just a couple of things.  I listened to

16  Mr. Wilkinson's statements and I almost felt like, you know, I

17  could go and have a glass of wine with him and talk about those

18  things.  But it was important, despite everything that he said

19  to the Court.  He really didn't bring any proof to the Court

20  and this is a Court of proof.

21      THE COURT:  I know we only have that person from

22  Oregon.  It is at least 10,000 thousand, maybe let's lower it

23  that to 8,000 persons.  So I note that.

24      MR. SALAS:  On the HIPAA that he was suggesting,

25  despite the fact that it is illegal in the HIPAA for anybody,

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

1    even a requester of any kind to obtain that kind of information

2    that he wanted us to obtain, he said that his own client could

3    not obtain records from the drugstore that were more than three

4    years old.  So even if you were to order anybody to try to get

5    that information, by his own client's own experience, those

6    records are not available because the class period here ended

7    in 2005.

8         So it was totally what he was he was talking about were

9    dreams, really, the way I felt.  Your Honor, the way -- the

10   only other thing that I wanted to say was that with respect to

11   the amount of attorneys' fees in the *Waters* case which, of

12   course, the Supreme Court denied a writ.  That was an award of

13   33 percent on a reversionary fund on 40 million.  The Court

14   specifically addressing the issue said in *Boeing vs. Van*

15   *Gambert* the Supreme Court settled this question by ruling "that

16   class counsel are entitled to a reasonable fee based on the

17   funds potentially available to be claimed regardless of the

18   amount actually claimed."  That is a direct quote in the *Waters*

19   case.  So the law says that what really the amount that you

20   need to consider is the settlement fund that we have created.

21        Now, having said that, the district court has great

22   latitude in giving the award as long as you explain your

23   reasoning.  And if you explain your reasoning the latitude that

24   you are given by the law will not be disturbed by a court on

25   appeal.

YVETTE RICHARDSON, CSR, RPR, CCR

06CV1230 — ALMA SIMONET, ET AL., v. GLAXOSMITHKLINE — FAIRNESS

1      So what I am telling the Court is based on the law,

2   based on everything that you have heard here today and the

3   statements that the Court has made during this hearing, you

4   have great latitude to give an award that is justifiable, Judge

5   and I think the amount of attorneys' fees that we have

6   requested is what the law entitles us to get.  It really

7   reflects the amount of work that we have put into this case;

8   the risks that we have taken over the past five years in as

9   much as even we, Mr. Nevares and myself and other counsel, we

10  have given up a lot of other case.  We have passed up a lot of

11  other opportunities to dedicate ourselves to this case.  We

12  have put money out of our own pocket to the risk in this

13  venture.  It is not that we ran around making money not doing

14  any work.

15      I would just say all these attorneys who came here to

16  object, where were these guys for the past five years?  Why did

17  they not help us?  Why did they not come and help the class if

18  they are really interested in the class?  Thank you, Your

19  Honor.

20      THE COURT:  Thank you.

21      Anything further?

22      MR. WILKINSON:  No, Your Honor.

23      THE COURT:  Thank you.  You are excused.

24      What I will do, obviously I have to make some written

25  findings.  I don't think anybody is requesting a transcript at

1    this time.

2         Okay.  Right?

3         MR. NEVARES:  No.

4         THE COURT:  I will use the rough draft for my own

5    internal purposes.

6         Thank you very much.

7         MR. NEVARES:  Thank you, Your Honor.

8         (Whereupon Court was adjourned)

9                              – – – – –

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              REPORTER'S CERTIFICATE

 2              I, YVETTE RICHARDSON, Official Court Reporter in the

 3  United States District Court for the District of Puerto Rico,

 4  appointed pursuant to the provisions of Title 28, United States

 5  Code, Section 753, and a Registered Professional Reporter

 6  certified by the National Court Reporter's Association, do

 7  hereby certify that the foregoing is a true and correct

 8  transcript of the proceedings had in the within entitled and

 9  numbered cause on the date hereinbefore set forth; and I do

10  further certify that the foregoing transcript has been prepared

11  under my direction.

12          Whereunto I have set my hand this 28th day of January

13  2010.

14

15

16

17  S/YVETTE RICHARDSON, CSR, RPR, CCR
       Official Court Reporter
18

19

20

21

22

23

24

25
```

YVETTE RICHARDSON, CSR, RPR, CCR